**Keith E. JOHNSON, Plaintiff,**

v.

**Andrew N. YURICK, II, individually and in his capacity as Gloucester County Prosecutor, Gloucester County Prosecutor's Office, County of Gloucester, Board of Chosen Freeholders of the County of Gloucester, and James B. Cannon, Defendants.**

**No. CIV.A. 99–3864(JEI).**

United States District Court, D. New Jersey.

Aug. 27, 2001.

Harold B. Shapiro, Vineland, NJ, for Plaintiff.

Jacqueline A. DeGregorio, Adam Kenny, Weiner Lesniak, Parsippany, NJ, for Andrew N. Yurick, II, and Gloucester, County Prosecutor's Office.

Christopher M. Farella, Genova, Burns & Verona, Livingston, NJ, for County of Gloucester, Gloucester, County Board of Chosen Freeholders, and James B. Cannon.

## OPINION

IRENAS, District Judge.

Presently before the Court is Defendants' Motion for Summary Judgment of Plaintiff Keith E. Johnson's federal and state claims relating to his termination as First Assistant Prosecutor of Gloucester County. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343, 1367. For the reasons set forth below, Defendants' motion is granted as to the federal claims and the state free speech claim, with the remaining state claims dismissed without prejudice for lack of federal jurisdiction.

## I. BACKGROUND

Plaintiff Keith E. Johnson ("Plaintiff" or "Johnson") began his employment with Defendant Gloucester County Prosecutor's Office in February 1981. From June 1986 to January 1997, he served as Chief of the Trial Section. From August 1996 to January 1997, he was also Acting First Assistant Prosecutor. When Defendant Andrew N. Yurick, II, ("Yurick") was sworn in as Gloucester County Prosecutor on January 31, 1997, he named Plaintiff as his First Assistant Prosecutor.

As First Assistant Prosecutor, Plaintiff was the chief operations officer and chief of staff in the Prosecutor's office—the "number two person"—with wide-ranging supervisory, administrative, budgetary, and prosecutorial responsibilities. He served as Yurick's deputy and liaison, reporting to him and effectuating his decisions. As Plaintiff himself noted, there was a perception that he and Yurick were "joined at the hip."

Prior to his swearing in, Yurick spoke with Plaintiff about his plans to adopt a stricter plea-bargaining policy, which he felt had been too lenient under his predecessor. According to Yurick, Plaintiff agreed with Yurick's assessment. They decided to centralize the plea bargaining process under the Chief of Trials, a position filled, at Plaintiff's suggestion, by Keith Warburton ("Warburton").

After the new policy was implemented, the backlog of cases in the county rose, as fewer cases pled out and fewer cases were remanded to municipal court. In meetings of the Delay Reduction Committee and in public statements, Judge Joseph F. Lisa, the Criminal Assignment Judge, was very critical of the new policy, arguing that the Prosecutor's Office was not offering appropriate plea bargains and that, as a result, the number of cases per judge was too high and delays in the trial calendar were increasing. Yurick defended his policy in the press and in meetings of the Delay Reduction Committee. In addition, according to Plaintiff, Yurick did not hold Judge Lisa in high regard and had allegedly commented that Judge Lisa was dictatorial and often issued rulings he knew were wrong. As a result, relations between Judge Lisa and Yurick's office deteriorated.

Plaintiff claims that, between June and November 1997, he and Yurick spoke about the possibility of decentralizing and liberalizing the plea bargaining policy. Plaintiff also claims that, in a November

1997 conversation in which he conveyed to Yurick the scope of the backlog, Yurick allegedly told him to "clean this mess up" and "deal with it." Yurick denies having given Plaintiff this directive.

Plaintiff concedes that he disagreed with the strict plea bargaining policy adopted by Yurick. As he stated in his deposition testimony, Plaintiff felt that Yurick violated public policy by clogging up the criminal justice system with cases and allowing significant delays in the trial calendar which hampered the Prosecutor's Office. He further testified that he felt certain plea bargains offered by Chief of Trials Warburton violated established law. He also stated that he felt that the judiciary had a very significant supervisory role to play in the administration of justice, but that it was Yurick's policy to disregard the courts' policy regarding the speedy disposition of cases.

In late December 1997, Plaintiff, in a conversation with Judge Lisa, indicated that he had ideas about alleviating the backlog of cases that he would like to share with the judge. When the two met in January 1998, Plaintiff's intent was to convey to the judge that he did not think the backlog was in the best interests of the citizens of Gloucester County. He did not dispute Judge Lisa's impressions that Yurick's policy was backfiring and that morale in the Prosecutor's Office was suffering. He and Judge Lisa discussed a number of ideas for addressing the backlog.

Prior to the meeting, Plaintiff did not inform Yurick that he would be seeing Judge Lisa. Plaintiff claims that the first he told Yurick of the meeting was within a week after it happened. Yurick recalls that Plaintiff told him of the meeting in February or early March.

During the meeting with Yurick, Plaintiff summarized his meeting with Judge Lisa and asked for Yurick's blessing in proceeding with the plan he and Judge Lisa had discussed. Yurick was furious. According to Plaintiff, Yurick told him that he had "screwed up my plans"—which Plaintiff took to mean Yurick's effort to obtain a third criminal judge in Gloucester County. Plaintiff also claims that Yurick told him that he had betrayed his trust. When Plaintiff responded that he was just following Yurick's orders, Yurick allegedly told Plaintiff that "the only interests you are interested in protecting is yourself, not mine and this office." Yurick then forbade Plaintiff from having further conversations with Judge Lisa.

According to Yurick, the episode regarding Judge Lisa occurred against a background of policy disagreements between Yurick and Plaintiff and conflicts between Plaintiff and other members of the Prosecutor's Office. Plaintiff had engaged Yurick in numerous "long, heated" discussions about a variety of policy issues, and had not supported, and at times opposed, Yurick in labor negotiations, personnel decisions, and other policy initiatives.

Yurick was also aware of growing conflict between Plaintiff and Warburton. At a September 1997 meeting, Plaintiff became "extremely heated" and "angry" in a discussion with Yurick and Warburton over the plea bargaining policy and Plaintiff's insistence that Warburton be removed as Chief of Trials. When Yurick asked the two men to stay to discuss the issue, Plaintiff admits he "blew [his] stack," yelling and screaming. Warburton later told Yurick that he and Plaintiff had ceased speaking to one another other than when absolutely necessary. Yurick was also aware that Plaintiff bullied Mary K. White, who was then Chief of the Grand Jury Section and who reported directly to Plaintiff. As a result, at the time of the Judge Lisa episode, Yurick maintains that

his relations with Plaintiff had already begun to sour.

On March 6, 1998, Yurick evaluated Plaintiff. Yurick gave Plaintiff negative marks regarding his dispute with Warburton, his handling of certain drug cases, and for his "secret meeting" with Judge Lisa about "policies adopted or promulgated by the GCPO." In a March 12, 1998, memo, Yurick notified Plaintiff that the chiefs of the trial section and of the grand jury section would now report directly to Yurick and not to Plaintiff.

While some members of the Prosecutor's Office noted that relations between Yurick and Plaintiff were strained prior to the Judge Lisa meeting, all those deposed agreed that their relationship deteriorated after Plaintiff disclosed the meeting to Yurick. As Yurick testified, he had lost confidence in Plaintiff, and Plaintiff's meeting with Judge Lisa demonstrated to him that Plaintiff "was willing to go behind [his] back to accomplish something that he thought was important." Moreover, he stated that he did not think Plaintiff was an honorable man in light of his demeaning attitude towards Warburton and White and his vehement disagreement with Yurick's policies and procedures, including the meeting with Judge Lisa.

On August 14, 1998, Yurick terminated Plaintiff's employment, citing, among other things, Plaintiff's meeting with Judge Lisa. Given the option of being fired or resigning, Plaintiff, on August 16, 1998, tendered his letter of resignation.

On August 13, 1999, Plaintiff filed the instant lawsuit, alleging that 1) Defendants violated his free speech rights under the First Amendment, 2) denied him due process under the Fourteenth Amendment, 3)

violated his rights under the New Jersey Constitution, 4) violated his rights under the New Jersey Conscientious Employee Protection Act and related common law, 5) vitiated a contract as formed by the employee manual, 6) denied Plaintiff health and other benefits, and 7) broke a good faith promise of continued employment on which Plaintiff relied.[1]

On May 25, 2001, Defendants filed this Motion for Summary Judgment.

## II. STANDARD OF REVIEW

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. DISCUSSION

### A. First Amendment

The Supreme Court has recognized that the First Amendment expressive rights of public employees are more restricted than those of public citizens in

---

**1.** Following the New Jersey Supreme Court's decision in *Golden v. County of Union*, 163 N.J. 420, 749 A.2d 842 (2000), Plaintiff voluntarily dismissed Count Five of the Amended Complaint, which alleged that the employee manual formed a contract.

general. *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). This holding stems from the need "to arrive at a balance between the interests of the [employee], as a citizen, to comment upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

 This balance underpins the three-part test articulated by the Third Circuit with regard to claims by public employees alleging retaliation for protected speech. *See, e.g., Baldassare v. New Jersey,* 250 F.3d 188, 194–95 (3d Cir.2001). First, the plaintiff must establish that his speech involved a matter of public concern. *Connick,* 461 U.S. at 147, 103 S.Ct. 1684. Then, the plaintiff must demonstrate that the value of his speech outweighs "the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Id.* at 150, 103 S.Ct. 1684. The outcome of this balancing test is a question of law to be determined by the court. *Waters v. Churchill,* 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion).

If the court determines that the speech is protected, the plaintiff must then establish that the speech was a "substantial or motivating factor in the alleged retaliatory action." *Baldassare,* 250 F.3d at 195. Finally, the burden shifts to the public employer to demonstrate that "it would have reached the same decision even in the absence of the protected [speech]." *Id.* (citations omitted). These determinations are questions of fact.

### 1. Public Concern

 In its en banc opinion in *Azzaro v. County of Allegheny,* 110 F.3d 968 (3d Cir.1997) (en banc), the Third Circuit gave district courts guidance in determining whether speech involves a matter of public concern:

Given that the basis for the special protection accorded public concern speech is its instrumental value to the community in enabling self-governance, a court asked whether a public employee's speech relates to a matter of public ·concern must determine whether expression of the kind at issue is of value to the process of self-governance. This task does not, of course, involve the court's passing judgment on the merit of the view expressed or its source. Rather, the issue is whether it is important to the process of self-governance that communications on this topic, in this form and in this context, take place.

*Id.* at 977. The court further stated that the "community's interest in the free exchange of information and ideas ... is implicated in private exchanges between two individuals as well as in exchanges between an individual and members of the public." *Id.* at 977–78. For instance, in *Azzaro,* the court found that reports of sexual harassment in a public office were matters of public concern. In *Connick,* the Supreme Court held that a questionnaire circulated by an assistant district attorney asking her colleagues in part whether they were pressured by supervisors to engage in political activity implicated matters of public concern. 461 U.S. at 149, 103 S.Ct. 1684. And in *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), the Court found that a public employee's comment to a coworker, after the assassination attempt on President Reagan, that the president should be shot for his policies involved matters of public concern. *Id.* at 386.

### 2. Public Employer's Interests

 As discussed, though, the value of such public concern speech must out-

weigh the public employer's interest "in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). As the Supreme Court held in *Rankin*, a court may consider, among other factors, "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* at 388, 107 S.Ct. 2891.

In *Sprague v. Fitzpatrick*, 546 F.2d 560 (3d Cir.1976), the Third Circuit indicated that the "key question ... is whether the employment relationship has been seriously undermined." *Id.* at 566. In *Sprague*, a first assistant district attorney publicly questioned the veracity of statements made by the district attorney. The court agreed that, in light of the fact that the speaker was the district attorney's "alter ego," his public statements "totally precluded any future working relationship" between the two. *Id.* at 565. "The crucial variant in this balance," the court held, "appears to have been the hierarchical proximity of the criticizing employee to the person or body criticized." *Id.* at 564. "Certainly we could not expect a district attorney to run an efficient office is his first assistant were free to impugn his integrity in public." *Id.* at 565.

Similarly, courts have held that a public employee in a policymaking role has "substantially less First Amendment protection than does a lower level employee." *McVey v. Stacy*, 157 F.3d 271, 278 (4th Cir.1998); *see also Moran v. State of Washington*, 147 F.3d 839, 850 (9th Cir. 1998); *Hall v. Ford*, 856 F.2d 255, 261 (D.C.Cir.1988). As the court in *Hall* stated, "The reason is self-evident. High-level

officials must be permitted to accomplish their organizational objectives through key deputies who are loyal, cooperative, willing to carry out their superiors' policies, and perceived by the public as sharing their superiors' aims." 856 F.2d at 263. "Indeed, we are most doubtful," the Ninth Circuit stated in *Moran*, "that the Constitution ever protects the right of a public employee in a policymaking position to criticize her employer's policies or programs simply because she does not share her employer's legislative or administrative vision." 147 F.3d at 850.

### 3. Plaintiff's Speech is Not Protected

 First, the Court must evaluate whether Plaintiff's comments to Judge Lisa related to matters of public concern. Defendant Yurick's main contention is that Plaintiff was pursuing his personal agenda and thus his remarks to Judge Lisa did not involve matters of public concern. However, as the Third Circuit indicated in *Azzaro*, a speaker's motives, while relevant, are not dispositive. 110 F.3d at 978.

Much more significant is that Plaintiff was genuinely concerned about the state of the criminal docket, the growing backlog of cases, and the impact on the prosecutor's office and on criminals' rights—issues of understandable importance to the citizens of Gloucester County. Also important is that the comments were in the context of a policy discussion between a high-ranking member of the Prosecutor's Office and the assignment judge. That Plaintiff disagreed with Yurick's policy does not temper the public's legitimate concern about such matters. Certainly when compared to other speech held to involve matters of public concern—such as the clerical employee's comments about President Reagan in *Rankin*—the nature of the comments here, and the context in which they were discussed, strongly sup-

port a finding that they implicate public concern.

That established, the Court must now determine whether the value of this speech was outweighed by legitimate interests of the State as a public employer. As the Court noted in *Sprague*, a "crucial variant in this balance" is "the hierarchical proximity of the criticizing employee to the person or body criticized." 546 F.2d at 564. Similar to the parties in *Sprague*, Plaintiff here was Defendant Yurick's deputy, chief of staff, and representative. As Plaintiff commented, many perceived they were "joined at the hip." From the record, it appears that Yurick trusted and relied upon Plaintiff to a great extent in keeping him informed and effectuating his policies. As a result, Yurick's loss of confidence in Plaintiff and sense of betrayal understandably undermined their close working relationship.

Furthermore, Yurick also had legitimate reason for not tolerating dissent among his top advisors. "High-level officials must be permitted to accomplish their organizational objectives through key deputies who are loyal, cooperative, willing to carry out their superiors' policies, and perceived by the public as sharing their superiors' aims." *Hall*, 856 F.2d at 263. While Plaintiff tries to portray himself as the dutiful lieutenant following his commander's orders, he readily concedes that he vehemently disagreed with Yurick regarding the plea-bargaining policy. He even testified that he believed that Yurick had violated a clear mandate of public policy. As the Ninth Circuit stated in *Moran*, it is doubtful "that the Constitution ever protects the right of a public employee in a policymaking position to criticize her employer's policies or programs simply because she does not share her employer's legislative or administrative vision." 147 F.3d at 850.

And while Plaintiff's criticisms were not public as were those in *Sprague*, it is significant that they were made to Yurick's chief opponent on the issue. Plaintiff was undoubtedly aware of the public and private sparring between Yurick and Judge Lisa on the plea bargaining policy. Yurick's dismay that Plaintiff was "willing to go behind [his] back" was only exacerbated by the fact that he was doing so with Judge Lisa. As a result, Yurick's faith in Plaintiff's loyalty suffered.

Plaintiff counters that he thought he was under orders to fix the backlog problem, that he had met with Judge Lisa many times before, and that he was shocked that Yurick was upset about the meeting. However, this argument misses the point. It is immaterial whether Plaintiff thought Yurick was justified in his anger. The fact remains that Yurick was furious at what he perceived to be Plaintiff's meeting with Judge Lisa behind his back and without discussing it with him first. Whether justifiably or not, Yurick felt Plaintiff was no longer a reliable deputy or assistant prosecutor.

It would be one thing if Plaintiff thought Yurick was using the meeting with Judge Lisa as a pretext for terminating his employment. Quite to the contrary, Plaintiff claims that Yurick's anger over the meeting was the "real reason" for his termination and not his strained relationships with other members of the staff. However, that contention does not support a First Amendment claim.

Thus, to conclude, the Court finds that Yurick's legitimate interests in terminating the employment of a key deputy who disagreed with him on fundamental issues and whom he perceived had betrayed him outweigh the recognized public import of Plaintiff's discussion with Judge Lisa. Accordingly, Plaintiff's speech was not protected by the First Amendment.

■ Because New Jersey courts "rely on federal constitutional principles in interpreting the free speech clause of the New Jersey Constitution," *Karins v. City of Atlantic City*, 152 N.J. 532, 706 A.2d 706, 713 (1998) (applying federal constitutional analysis to public employee's retaliation claim), the Court also finds that Plaintiff's speech was not protected under the New Jersey Constitution.

## B. Due Process and Equal Protection

Plaintiff claims that the termination of his employment also violated his due process and equal protection rights under the Fourteenth Amendment.

■ New Jersey law provides that "[a]ssistant prosecutors ... may be appointed by the prosecutors ... [and] shall hold their appointments at the pleasure of the respective prosecutors...." N.J.S.A. 2A:158–15. As the New Jersey Supreme Court held in *Golden v. County of Union*, 163 N.J. 420, 749 A.2d 842 (2000), "the statute unambiguously creates an at-will employment relationship between the prosecutor and all assistant prosecutors...." *Id.* at 845. This reflects a longstanding recognition that "since the county prosecutor is charged with heavy enforcement responsibilities he must be given broad powers to appoint his own personnel; thus he appoints his own assistant prosecutors ... within the maxima prescribed by statute." *Cetrulo v. Byrne*, 31 N.J. 320, 157 A.2d 297, 301 (1960).

■ The United States Supreme Court had held that a public employee with no statutory or contractual entitlement to his employment has no property interest subject to the protection of the Fourteenth Amendment. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Bd. of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Because Plaintiff is an at-will employee and

accordingly has no protected property interest in his employment, his property interest claim fails as a matter of law.

■ To establish a liberty interest claim, Plaintiff must demonstrate that the adverse employment action was based on a "charge against him that might seriously damage his standing and associations in his community" or "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Roth*, 408 U.S. at 564, 92 S.Ct. 2701. In this case, Yurick's decision to terminate Plaintiff's employment was based on his concern about Plaintiff's loyalty and discretion as well as his relations with other members of the staff, and not on any charges of immorality which would harm Plaintiff's "standing in the community." Additionally, Plaintiff has not put forward any facts to suggest that Yurick was somehow responsible for any difficulty he had obtaining subsequent employment. Certainly, incidental to any loss of employment, friends and colleagues ask questions about the circumstances, and rumors may abound. But, such idle chatter does not create a stigma of constitutional magnitude, particularly where, as Plaintiff concedes, "no real reason was ever publicized." As a result, Plaintiff's liberty interest claim must also fail as a matter of law.

■ Finally, Plaintiff asserts that his termination violated his equal protection rights, arguing that he was fired whereas other assistant prosecutors were simply demoted. Notably, Plaintiff cites no caselaw to support his claim. As the Court cannot divine a theory under which Plaintiff could establish such a claim, and in light of Yurick's broad discretion in personnel matters, Plaintiff's equal protection

·claim fails as a matter of law.[2]

## C. Remaining State Claims

 Under 28 U.S.C. § 1367(c), a district court "may decline to exercise jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." The Third Circuit has stated that where a party's federal claims are disposed of on a summary judgment motion, the court should generally refrain from exercising supplemental jurisdiction over the remaining state claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 195–96 (3d Cir.1976); *see also Simmerman v. Corino*, 804 F.Supp. 644, 658 (D.N.J.1992). Finally, there are no extraordinary circumstances, such as a substantial investment of time, which would warrant this Court's retaining supplemental jurisdiction over the Plaintiff's remaining state statutory and common law claims. *See Hewlett v. Davis*, 844 F.2d 109, 115 (3d Cir.1988).

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion is granted as to the First Amendment, due process, and equal protection claims, as well as his state free speech claim. The remaining state claims are dismissed without prejudice for lack of federal jurisdiction. The Court will enter an appropriate order.

---

**2.** Because Plaintiff has failed to establish any of his federal constitutional claims, they must be dismissed as to all Defendants.