780 A.2d 585 (2001)
344 N.J. Super. 136
STATE of New Jersey, Plaintiff-Respondent,
v.
William BRENNAN, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 11, 2001.
Decided September 28, 2001.
*586 William Brennan, appellant, argued the cause pro se.
Pia S. Perez, Assistant Prosecutor, argued the cause for respondent (William H. Schmidt, Bergen County Prosecutor, attorney; Ms. Perez, of counsel and on the brief).
Before Judges PRESSLER, CIANCIA and PARRILLO.
The opinion of the court was delivered by CIANCIA, J.A.D.
Defendant William Brennan was charged with disrupting a public meeting, N.J.S.A. 2C:33-8, and defiant trespass, N.J.S.A. 2C:18-3b. He was found guilty of both offenses in municipal court and appealed to the Superior Court, Law Division. After a trial de novo on the record, Judge Joseph Conte found defendant guilty of defiant trespass, but not guilty of disrupting a public meeting. Appropriate fines, penalties and assessments were imposed.
On appeal to this court, defendant contends:
POINT I THE CHARGE IS UNCONSTITUTIONAL AS APPLIED TO THESE FACTS.
POINT II THE STATE CANNOT ESTABLISH NECESSARY ELEMENTS OF THE OFFENSE.
POINT III APPELLANT HAS AN AFFIRMATIVE DEFENSE.
POINT IV JUDGE CONTE COMMITTED CLEAR ERROR.
POINT V JUDGE CONTE'S OPINION WAS BASED UPON A TAINTED RECORD.
POINT VI APPELLANT HAS BEEN DENIED EQUAL PROTECTION.
We find defendant's contentions without merit and affirm his petty disorderly persons conviction for defiant trespass.
The events giving rise to the charges against defendant occurred at a January 4, 2000 meeting of the Teaneck Town Council.[1] Defendant, a Teaneck firefighter and *587 former president of the firefighter's union, addressed the mayor and six other council members during the "public input" portion of the meeting. He criticized the township's employment of a particular law firm hired to assist the township in litigation with the firefighters' union. Defendant believed that firm had a conflict of interest. The mayor, who chaired the council, told defendant that that topic would be more appropriately addressed during the later "good and welfare" portion of the meeting. Defendant made a few more remarks and sat down.
When the "good and welfare" portion of the meeting took place, defendant was given permission to speak for three minutes, the customary time allotted. Defendant addressed himself to a labor contract issue that had gone to arbitration. The township had appealed some aspects of the award to the Public Employment Relations Commission and defendant took issue with that decision. He apparently believed the township's appeal was taken in bad faith and he specifically criticized the township's requests for a stay of the arbitration award. In that context, defendant said, "and on it goes. And that is what we call a lawless ... lawlessness in this country." Councilwoman Kieliszek then expressed her displeasure at defendant's use of the word lawless. A short dialogue between defendant, the councilwoman and the mayor then ensued, followed by a dispute between defendant and the mayor as to whether defendant had used up his three minutes of speaking time. Defendant was instructed to sit down, but refused to do so until he had finished speaking. The mayor said if defendant did not sit down the police would remove him. Defendant responded, "[y]ou get the police in here because I am not finished." The mayor "warned" defendant again and defendant said, "[l]et them come ... bring them on." A council member suggested a recess. Defendant contended he had not used his allotted speaking time because he had been interrupted. The mayor told defendant he was discourteous, abrasive, immature and antagonistic. Defendant made an additional comment to the effect that "[w]e will do everything we can to make sure" that the mayor's term would soon be finished. Defendant then said he would sit down and apparently did so. A recess was called and the mayor pushed a silent alarm button notifying the police that they were needed.
At trial, the mayor, five council members and the township manager who was present during the meeting, testified to their perceptions of what had occurred, including defendant's demeanor. We need not detail that testimony, but the consensus was that defendant was agitated, upset and red in the face. Some of the witnesses described him as menacing, alarming, rude, disrespectful, frustrated and "tending to be disruptive." There was a concern that the situation was getting out of hand.
Defendant did not testify at trial, but he presented two witnesses who were present at the meeting and one who had watched it on a local television channel. One witness, defendant's wife, testified that defendant's demeanor was "normal" and, although he was "upset" at not being allowed to continue speaking, his demeanor really did not change. Rather, in her opinion, it was the mayor who became agitated and angry.
*588 The two other defense witnesses did not testify specifically as to defendant's demeanor and conduct prior to the arrival of the police, except to note that defendant had made no threatening gestures toward the council.
Two of the officers who arrived at the council shortly after the alarm was pressed were Sergeant Thomas Sullivan and Patrolman Thomas Finley. Sergeant Sullivan testified that, upon his arrival, he spoke with the mayor and the township manager was also present:
I asked him if there was a problem and he had told me that Mr. Brennan was acting irrational and that they had to stop the Council meeting and that they wantedthey wanted him to be removed from the meeting.
Q. Had any of the other officers
THE COURT: Again, I didn't hear that. They wanted him
THE WITNESS: To be removed from the meeting so that they could continue with the meeting.
Q. Had any of the other police officers already gone into the Council chambers?
A. Yes. Officer Finley had and I believe Officer Abraham was with him.
Q. Okay. After you discussed this with Mayor Ostrow, what if anything did you do?
A. I asked the Mayor for the specifics as to what had occurred. He had said Mr. Brennan had gone beyond his allotted time, was using obscenities and using an alarming conduct of voice towards the Council members, and that he was interfering with the meeting and that, you know, they would like him to leave the meeting. At that time, I went inside and I spoke with Mr. Brennan, who was seated in the front row.
Q. Did you know Mr. Brennan?
A. Yes, I know Mr. Brennan. I askedI advised him that he was going to have to leave the meeting. That I was told by the Mayor that he was interfering with the meeting and its progress and I asked him to please leave the meeting.
Q. What was his response?
A. He said we would have to drag him out of there. That he wasn't leaving.
Q. Was hewhowhen you say "we would have to drag him out of there," who was with you at the time?
A. Officer Finley and Officer Abraham.
Q. Do you know whether or not either Officer Finley or Officer Abraham repeated that request to Mr. Brennan?
A. Officer Finley did that I know of. I, myself, also repeated it, asking him several times to please leave.
Q. And how long a time period elapsed during this inquiry stage?
A. Approximately two minutes.
Q. Did Mr. Brennan have any other response other than you'd have to drag him out?
A. He said we were going to have to arrest him, that he was not going to leave. That he was entitled to be at the meeting.
Q. And what if anything did you do then?
A. At that point, I went back out into the hall and again spoke with the Mayor and Mr. Saage and advised them of Mr. Brennan's response, and asked the Mayor if he was going toyou know, would sign a complaint for interfering with the meeting and if they did, in fact, want us to remove him. They said that they wouldthe Mayor said that he would sign a complaint for interfering with the meeting. At which time, *589 I went back inside and again spoke with Mr. Brennan, and again asked him to please leave, that you know we would have to arrest him if he did not leave. And he again refused. At which time, we placed Mr. Brennan under
THE COURT: You're trailing off and I'm having a hard time hearing.
THE WITNESS: Okay. Sorry.
THE COURT: Okay. You went back in?
THE WITNESS: Right.
THE COURT: And then what happened?
A. I again asked Mr. Brennan to please leave. I stated that complaints were going to be signed against him and that he was going to be placed under arrest if he did not leave. He again refused to leave and stated that we would have to arrest him. At which time, we advised him he was under arrest.
Q. And what did you do then?
A. Mr. Brennan stood up. We placed him in handcuffs and brought himtransported him over to Teaneck Police Headquarters.
Sullivan added that he had no reason to doubt what he had been told by the mayor and township manager, but he conducted no further investigation of the allegations against defendant before effectuating the arrest.
Patrolman Finley testified similarly:
Q. And after you arrived and observed Mr. Brennan seated in the front row, what if anything did you do?
A. I was advised along with my sergeant, by the Township Manager Gary Saage and the Mayor, Mr. Ostrow, of what had happened, at which time
Q. What did they tell you had happened?
A. They advised me that Mr. Brennan was being disruptive and they did not want him at the meeting and they couldn't continue the meeting with him there.
Q. Okay. And what, if anything, did you do?
A. I advised Mr. Brennan that he had to leave.
Q. Okay. And how did you do that?
A. Verbally.
Q. And did you go over to him or did you yell across the room?
A. No, I was face to face with him.
Q. Okay. Do you know Mr. Brennan?
A. Yes, I do.
Q. Did you know him prior to that evening?
A. Yes, I do.
Q. So you had no trouble identifying who he was.
A. No, sir.
Q. Can you tell me exactly what you said to him and what he said?
A. I basically advised him several times that he would have to leave the meeting, at which time he refused.
Q. About how many times did you ask him to do that?
A. Several times.
Q. Did you tell him that he would be placed under arrest if he did not leave the meeting?
A. Yes.
Q. And did you do that more than once?
A. Yes.
Q. Okay. And what, if anything, did he do after you advised him of that?
A. He still refused to leave.
Q. Did you confer with your sergeant?
A. Yes, I did.
*590 Q. And did you receive any directives from your sergeant?
A. After we spoke, I asked him one more time and then I was advised by Sergeant Sullivan to
MR. TOSI: Objection, Your Honor. Hearsay.
Q. As a result of comments made to you by your sergeant, what if anything did you do?
A. I placed Mr. Brennan under arrest.
Finley acknowledged that he did not witness any disruptive conduct by defendant, but rather, relied upon what he was told.
On the record presented we are satisfied that the State's credible proofs were sufficient to support a conclusion beyond a reasonable doubt that defendant was guilty of defiant trespass. In relevant part, N.J.S.A. 2C:18-3b provides:
A person commits a petty disorderly persons offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by:
(1) Actual communication to the actor....
Defendant's contentions, as set forth in his brief and as presented to us at oral argument, focus in large part on whether he had, in fact, been disruptive and whether the mayor and council acted properly in their conduct toward him, including the request to the police that defendant be removed from the meeting. In our view, the charge of defiant trespass turns not so much on the correctness of the council's evaluation and reaction to defendant's conduct, but rather, on the reasonableness of the police actions and defendant's response thereto. Simply stated, if the police are performing a law enforcement function in an appropriate manner, i.e., not with an excessive use of force, then a citizen is obligated to comply with the directions of the police. Failure to do so can result in a number of offenses, including obstruction, N.J.S.A. 2C:29-1; hindering, N.J.S.A. 2C:29-3b; resisting arrest, N.J.S.A. 2C:29-2 and, in this instance, defiant trespass. If the police action is without proper legal authority there are a variety of remedies and defenses that can be invoked by the wronged party at a later time.
In State v. Lashinsky, 81 N.J. 1, 404 A.2d 1121 (1979), a press photographer was convicted for being a disorderly person because he failed to heed a police officer's order to move away from an automobile accident. In affirming the conviction, Justice Handler writing on behalf of the court, stated:
Courts are attuned to gauge the reasonableness of a policeman's actions in citizen-police confrontations and to sort out police behavior which is lawful and proper from that which is not. E.g., Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L. Ed.2d 612, 617 (1972); Terry v. Ohio, 392 U.S. 1, 20-27, 88 S.Ct. 1868, 1879-1883, 20 L.Ed.2d 889, 905-909 (1968); State in Interest of H.B., 75 N.J. 243, 248, 381 A.2d 759 (1977) (stop-and-frisk case); State v. Washington, 57 N.J. 160, 162-163, 270 A.2d 282 (1970); State v. Mulvihill, 57 N.J. 151, 155-159, 270 A.2d 277 (1970); State v. Moriarty, 133 N.J.Super. 563, 573-575, 338 A.2d 14 (App.Div.1975), certif. den. 68 N.J. 172, 343 A.2d 459 (1975) (resisting arrest cases). Judge Goldmann observed that "... [t]he duty of police officers, "..., is `not merely to arrest offenders, but to protect persons from threatened wrong and to prevent disorder. In the performance of their duties they may give reasonable directions' " . State v. Taylor, supra, 38 N.J.Super. at 30, 118 A.2d 36, quoting *591 from People v. Nixon, 248 N.Y. 182, 188, 161 N.E. 463, 466 (Ct.App.1928) and People v. Galpern, 259 N.Y. 279, 181 N.E. 572 (Ct.App.1932); accord, State v. Manning, supra, 146 N.J.Super. at 596, 370 A.2d 499. The average citizen is, likewise, held to a similar standard and deemed capable of differentiating between permissible and impermissible behavior. Reasonableness is the key. Hence, where an officer's instructions are obviously reasonable, in furtherance of his duties, an individual toward whom such instructions are directed has a correlative duty to obey them. State v. Taylor, supra. If his refusal to respond results in an obstruction of the performance of the officer's proper tasks, this will constitute a violation of the disorderly persons statute.

[Id. at 10-11, 404 A.2d 1121.]
Justice Handler went on to quote approvingly from State v. Taylor, 38 N.J.Super. 6, 118 A.2d 36 (App.Div.1955), where Judge Goldmann, in the context of affirming a conviction for interfering with a police officer in the lawful discharge of his duty, stated:
Failure to obey a police order to "move on" can be justified only where the circumstances show conclusively that the order was purely arbitrary and was not calculated in any way to promote the public order. As was said in the Galpern case, the courts cannot weigh opposing considerations as to the wisdom of a police officer's directions when he is called upon to decide whether the time has come in which some directions are called for.

[Id. at 30, 118 A.2d 36.]
Judge Goldmann also set forth the following language from People v. Galpern, 259 N.Y. 279, 181 N.E. 572 (Ct.App.1932): "* * * The duty of police officers, it is true, is `not merely to arrest offenders, but to protect persons from threatened wrong and to prevent disorder. In the performance of their duties they may give reasonable directions.' People v. Nixon, 248 N.Y. 182, 188, 161 N.E. 463, 466. Then they are called upon to determine both the occasion for and the nature of such directions. Reasonable discretion must, in such matters, be left to them, and only when they exceed that discretion do they transcend their authority and depart from their duty. The assertion of the rights of the individual upon trivial occasions and in doubtful cases may be ill-advised and inopportune. Failure, even though conscientious, to obey directions of a police officer, not exceeding his authority, may interfere with the public order and lead to a breach of the peace."

[Ibid.]
Analogously, a private citizen may not resist an announced arrest by one he knows to be an authorized police officer, even if the arrest is illegal under the particular circumstances. State v. Mulvihill, 57 N.J. 151, 156, 270 A.2d 277 (1970); State v. Seymour, 289 N.J.Super. 80, 85-87, 672 A.2d 1273 (App.Div.1996); State v. Koonce, 89 N.J.Super. 169, 183-184, 214 A.2d 428 (App.Div.1965); N.J.S.A. 2C:29-1. Moreover, a citizen's duty to submit obtains when the restraint by the police officer is for any lawful purpose even if it does not amount to an arrest. Mulvihill, supra, 57 N.J. at 156, 270 A.2d 277; Seymour, supra, 289 N.J.Super. at 87, 672 A.2d 1273; State v. Moriarty, 133 N.J.Super. 563, 573, 338 A.2d 14 (App.Div.), certif. denied, 68 N.J. 172, 343 A.2d 459 (1975).[2]
*592 Here, the police acted reasonably in light of the surrounding circumstances. There was no showing, much less a "conclusive" showing, that the police officers acted arbitrarily or in a manner not calculated in any way to promote public order. Compare State v. Kane, 303 N.J.Super. 167, 696 A.2d 108 (App.Div.1997) (a defendant removed from a public meeting by the police without a direction from the chair of the meeting and without notice to defendant that he was under arrest, could not be convicted of resisting arrest). They were not obligated to conduct a full-fledged investigation of the allegations presented to them by the mayor prior to asking defendant to leave the premises. A public meeting had been halted allegedly because defendant had been disruptive. The meeting was apparently going to continue after the recess. The police did not initially arrest defendant, but rather, gave him direction to leave the premises. Defendant, at that point, had no discretion to disobey that direction. His refusal to leave constituted defiant trespass. He was warned that arrest would be the consequence of his continued refusal to leave.
While these facts are perhaps not the most common example of defiant trespass, nevertheless, all the elements of the statute were satisfied. Although defendant had been lawfully on the premises, when the police officers asked him to leave, that privilege was revoked. The notice to leave was clearly and repeatedly given. Defendant was told of the consequences of not voluntarily leaving. The offense did not turn on whether defendant had actually been disruptive. The mayor conveyed a scenario to the police that justified the action they took. If that scenario was inaccurate or ill-motivated, defendant had remedies available to him through appropriate legal channels. Similarly, if defendant's First Amendment rights were impinged by his removal from the meeting, that deprivation could be addressed at a later time. The remedy that was not available to defendant was the defiance of a police officer's direction given in the lawful course of the officer's employment.
Defendant raises a variety of other issues on appeal. We have reviewed them in light of the applicable law and find them without sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). We note only that to the extent those contentions concern alleged errors at the municipal court level, this court, on review of a trial de novo in the Law Division, is not bound by the municipal court. State v. Joas, 34 N.J. 179, 184, 168 A.2d 27 (1961); State v. Oliveri, 336 N.J.Super. 244, 251, 764 A.2d 489 (App.Div.2001); State v. Hulsizer, 42 N.J.Super. 224, 228-229, 126 A.2d 47 (App.Div.1956); State v. Baumgartner, 21 N.J.Super. 348, 351, 91 A.2d 222 (App.Div. 1952).
We are satisfied there was sufficient credible evidence to support defendant's conviction in the Law Division. State v. Johnson, 42 N.J. 146, 157, 199 A.2d 809 (1964); State v. Cerefice, 335 N.J.Super. 374, 382-384, 762 A.2d 668 (App.Div.2000).
Defendant's judgment of conviction is accordingly affirmed.
NOTES
[1] The meeting was televised and shown to local residents. A videotape of the meeting was entered into evidence and played in municipal court. It was also viewed by the Law Division judge. The tape has been presented to us as part of the appellate record and we have reviewed it. No official transcript of the meeting was moved into evidence. Our factual recitation is derived from the testimony and evidence presented to the trial courts, including our viewing of the videotape. A second videotape was submitted to us, allegedly depicting defendant while in jail, but that tape has played no part in our decision.
[2] A citizen may, of course, protect himself when the police use excessive force, Mulvihill, supra, 57 N.J. at 157, 270 A.2d 277, but that proposition is not germane to the present facts.