886 A.2d 1056 (2005)
381 N.J. Super. 412
Robert Wayne TARUS, Plaintiff-Appellant,
v.
BOROUGH OF PINE HILL, Mayor Leslie Gallagher and Police Chief John Welker, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted October 24, 2005.
Decided November 23, 2005.
*1059 Thomas Bruno, for appellant.
White & Williams, Cherry Hill, for respondents, Borough of Pine Hill and Mayor Leslie Gallagher (Michael O. Kassak, of counsel, and Robert E. Campbell, on the brief).
Garrigle and Palm, William A. Garrigle, Cherry Hill, for respondent, Police Chief John Welker (William A. Garrigle and Cynthia L. Sozio, on the brief).
Before Judges PARRILLO, HOLSTON, JR., and GILROY.
The opinion of the court was delivered by
PARRILLO, J.A.D.
Plaintiff, Robert Tarus, sued the borough, mayor, and police chief of Pine Hill, alleging that he had been arrested without probable cause, maliciously prosecuted, and defamed when he refused to stop videotaping council meetings, a right to which he claims entitlement under both Article I, ¶ 6 of the New Jersey Constitution and state common law. The motion judge disagreed and granted defendants summary judgment, dismissing all claims. Plaintiff appeals, and we affirm.
The facts, which are undisputed, may be briefly stated. Plaintiff, a resident of Pine Hill Borough who regularly attends borough council meetings, was permitted to videotape the June 19, 2000 session because no one on the council or in the audience objected. Although plaintiff suggested at that time that he would be videotaping future meetings, he did not attend another meeting until September 18, 2000, when he began videotaping the public session without permission. Mayor Leslie Gallagher polled those present and found that several members of the audience did not wish to be videotaped. Plaintiff refused three requests of Mayor Gallager to turn off the video camera, stating that he had the right to videotape the proceedings under the Maurice River Tp. case[1]. The mayor then asked Police Chief John Welker to remove plaintiff, and Chief Welker asked plaintiff to stop recording. Plaintiff responded that the only way that the camera would be turned off would be if Chief Welker arrested him. Chief Welker *1060 turned off the video camera and escorted plaintiff out of the meeting room, where he offered to permit plaintiff back into the meeting room if he agreed to keep the camera off. Plaintiff again refused, and Chief Welker then formally charged plaintiff with disorderly conduct in violation of Borough Ordinance 3-11.1b.
An editorial account of the event appeared in the September 20, 2000 Courier-Post newspaper. A quote from Mayor Gallagher was included in the editorial which read:
The council didn't want him to film them. I asked him to turn off the camera, and he refused to do it. We can't permit private people to film. If it was an organized filming, that would be different.... If he was a decent resident, we would have no problem.
Basically, the same sequence occurred again at the October 23, 2000 council meeting. Plaintiff set up his video camera on a tripod in the back of the meeting room. Several audience members expressed a desire not to be videotaped. Consequently, the mayor repeatedly asked plaintiff to turn the video camera off and even offered him the opportunity to videotape the proceedings from the front of the meeting room so the audience would not be included in the footage. Plaintiff, however, refused, citing the Maurice River Tp. case. The Borough Solicitor attempted to explain that decision to plaintiff, but plaintiff disagreed with the solicitor's interpretation. At the mayor's instruction, Chief Welker then escorted plaintiff from the meeting room and again requested that plaintiff keep the video equipment off. In the course of a twenty-minute conversation outside of the meeting room, plaintiff told Chief Welker he would have to arrest him in order to keep his camera off. Chief Welker then arrested him for violating the borough's disorderly conduct ordinance.
One week later, on October 31, 2000, a municipal court judge found plaintiff not guilty of the two disorderly conduct charges, reasoning that plaintiff "had a right here to assert his right to film this meeting and ... he did it in a manner which was not violative of our disorderly conduct statute." Since then, plaintiff has been permitted to videotape council meetings.
On September 20, 2001, plaintiff filed a 42 U.S.C.A. § 1983 action against defendants in the Federal District Court, claiming that he had been arrested without probable cause and maliciously prosecuted in violation of his civil rights. The District Court granted defendants' motions for summary judgment as to all of plaintiff's federal claims, but declined to exercise supplemental jurisdiction over his state law claims, dismissing them instead without prejudice. The court dismissed plaintiff's federal claims of false arrest and malicious prosecution because plaintiff's refusal to obey the police chief's order to stop videotaping and consequent disruption of council meetings established probable cause for arrest. In this regard, the court specifically found:
probable cause for Chief Welker to determine that Plaintiff's purpose was to disrupt a lawful meeting, and that his acts tended to obstruct or interfere with the meeting. Thus, it would have been reasonable for Welker to issue Plaintiff a Disorderly Persons Summons under the Pine Hill Borough Ordinance and Plaintiff has not established that, taking his allegations to be true, his constitutional rights would have been violated.
On appeal, the Third Circuit Court of Appeals affirmed the grant of summary judgment, agreeing with the District Court that because Chief Welker had probable cause to arrest plaintiff, and did not engage in any wrongdoing in arresting plaintiff, *1061 the claims for false arrest and malicious prosecution fail. Tarus v. Borough of Pine Hill, 105 Fed.Appx. 357 (3d Cir. 2004).
After dismissal of his federal lawsuit, plaintiff filed a complaint in the Law Division reiterating the state law claims originally alleged in the federal action, namely, false arrest, malicious prosecution, defamation, and violation of his rights under the New Jersey Constitution and common law. In separate rulings, the motion judge granted summary judgment first in favor of defendant Welker, and then on behalf of defendants, Borough of Pine Hill and Gallagher. The judge found no state constitutional right to videotape a public meeting and no violation, in this instance, of any common law right. Finding dispositive the fact that plaintiff "disobeyed a police officer's order or command," the judge concluded that the federal court's dismissal of plaintiff's false arrest and malicious prosecution claims barred relitigation of these identical counts under the doctrine of res judicata. Finally, he dismissed the defamation claim, reasoning the offending comment was mere opinion not susceptible of being proven or disproven factually.
The primary issue on appeal is whether there is a state constitutional right to videotape public meetings of a township governing body. Plaintiff makes no claim under the federal constitution, and rightly so. Such an absolute right has never been recognized. See Whiteland Woods, L.P. v. Tp. of W. Whiteland, 193 F.3d 177, 183-84 (3d Cir.1999). There, the Third Circuit held that a township's ban on video recording of a public meeting did not violate the First Amendment. Id. at 184. Indeed, "[t]he First Amendment does not require states to accommodate every potential method of recording its proceedings, particularly where the public is granted alternative means of compiling a comprehensive record." Id. at 183.
The free speech guarantee in the New Jersey Constitution is embodied in Article I, paragraph 6, which provides:
Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press.
[N.J. Const. art. I, ¶ 6.]
To be sure, "the New Jersey Constitution's right of free speech is broader than the right against governmental abridgement of speech found in the First Amendment." N.J. Coal. Against War in the Middle East v. J.M.B. Realty Corp., 138 N.J. 326, 353, 650 A.2d 757 (1994), cert. denied sub nom., Short Hills Assoc. v. N.J. Coal. Against War in the Middle East, 516 U.S. 812, 116 S.Ct. 62, 113 L.Ed.2d 25 (1995); State v. Schmid, 84 N.J. 535, 423 A.2d 615 (1980), appeal dismissed sub nom., Princeton Univ. v. Schmid, 455 U.S. 100, 102 S.Ct. 867, 70 L. Ed.2d 855 (1982). Yet, although it may afford greater free speech protection, plaintiff points to no language in the constitutional provision suggesting it is expansive enough to encompass a right to videotape public proceedings, much less expressly identifying one. Nor does plaintiff cite to any authoritative case law recognizing such a state constitutional right, and we are aware of none.
Instead, plaintiff relies on the lower court's decision in Maurice River Tp.; however, the public's right to videotape school board meetings recognized in that opinion was based on the common law, not the First Amendment or state constitution. Maurice River Tp., supra, 187 N.J.Super. at 568, 455 A.2d 563 (holding "[t]his right is bottomed ... upon common law commitment to (paraphrasing Woodrow Wilson) *1062 `open government openly arrived at.'"). Our decision on appeal also declined to find a state constitutional right, holding only, in response to the township's request to enjoin the teachers' association from videotaping a public meeting, that there is no "per se constitutional ... impediment[ ] to the use of a video camera to tape and record the public proceedings of the Board of Education." Maurice River Tp., supra, 193 N.J.Super. at 492, 475 A.2d 59. And even to the extent we found a right to videotape based on the common law, we held the exercise of such a right was not absolute, but subject to reasonable governmental regulation and control. Id. at 493-94, 475 A.2d 59.
We recognize, of course, New Jersey's strong public policy favoring open government and "the general public['s] ... right to be fully informed on the actions of its elected officials." Sudol v. Borough of N. Arlington, 137 N.J.Super. 149, 153, 348 A.2d 216 (Ch.Div.1975); see also Times of Trenton Publ'g Corp. v. Lafayette Yard Cmty. Dev. Corp., 183 N.J. 519, 529, 874 A.2d 1064 (2005) (stating "New Jersey has a strong, expressed public policy in favor of open government."). This longstanding tradition is embodied in such statutory enactments as the Open Public Meetings Act, N.J.S.A. 10:4-6 to -21, and the Open Public Records Act, N.J.S.A. 47:1A-1 to - 13, ensuring public access to governmental proceedings and records respectively. We, therefore, have no hesitation in holding that plaintiff's right of access to the public proceedings of borough council is not only founded on statute, N.J.S.A. 10:4-7; N.J.S.A. 47:1A-1, but also emanates from the free speech guarantee of the New Jersey Constitution. See Schmid, supra, 84 N.J. at 535, 423 A.2d 615. Indeed, the free speech guarantee protects not only the free discussion of governmental affairs, but also the corresponding right to receive information and ideas so that the discussion be informed. Globe Newspaper Co. v. Superior Court for Norfolk, 457 U.S. 596, 604-05, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248, 255-56 (1982); Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542, 549 (1969); see also Lawrence v. Bauer Publ'g & Printing, 89 N.J. 451, 476, 446 A.2d 469 (stating "[t]he First Amendment protects an individual's activity in speaking in public forums," and encouraging citizen participation in governmental affairs), cert. denied, 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 395 (1982); Davis v. N.J. Dep't of Law & Pub. Safety, Div. of State Police, 327 N.J.Super. 59, 76, 742 A.2d 619 (Law Div.1999) (stating "the public has a vital interest in informed discussion of governmental affairs[ ]").
This much is undoubtedly clear. What plaintiff has failed to demonstrate, however, is the essential nexus between the right of access and the right to videotape so that the latter may be said to be subsumed within the former. On the contrary, we perceive no correlation in this instance between plaintiff's right to receive and communicate information and the particular manner in which plaintiff chooses to record the information received. No claim is made that the council's ban on videotaping prevented plaintiff from expressing his views before the council, limited his access to the public meeting, or impeded his ability to otherwise accurately record the proceedings. As the court in Whiteland Woods, supra, noted in concluding that a right of access to a public meeting does not create a corresponding federal constitutional right to videotape the meeting:
The Township did not curtail Whiteland Woods' ability to express its views before the Planning Commission or to compile an accurate record of the proceedings. Nor did it prohibit interested parties, reporters, or members of the *1063 public from attending the meetings or limit the gathering of information by means other than by videotaping. Spectators were free to take notes, use audio recording devices, or even employ stenographic recording. Nothing in the record suggests videotaping would have provided a uniquely valuable source of information about Planning Commission meetings.
[193 F.3d at 183.]
So too here. There has been no showing in this case that the council's temporary and limited prohibition on videotaping meaningfully interfered with plaintiff's and the public's ability to inform themselves of the proceedings or their rights of access thereto. Absent any demonstration that the restriction limits the underlying right of access, we decline, as did the court in Whiteland Woods, supra, in addressing the federal constitutional claim, to find that the general right of access affords any basis for plaintiff's claim that the New Jersey Constitution compels a specific right to videotape. See Johnson v. Yurick, 156 F.Supp.2d 427, 436 (D.N.J.2001) (stating that "New Jersey courts `rely on federal constitutional principles in interpreting the free speech clause of the New Jersey Constitution'" (quoting Karins v. City of Atlantic City, 152 N.J. 532, 547, 706 A.2d 706 (1998))), aff'd, 39 Fed.Appx. 742 (3d Cir.2002); Binkowski v. State, 322 N.J.Super. 359, 369, 731 A.2d 64 (App.Div.1999) (explaining that "[t]he New Jersey Supreme Court `ordinarily interprets our State Constitution's free speech clause to be no more restrictive than the federal free speech clause....'" (quoting Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 264, 716 A.2d 1137 (1998), cert. denied, 527 U.S. 1021, 119 S.Ct. 2365, 144 L.Ed.2d 770 (1999))).
Plaintiff then is left at most with a common law right recognized in Maurice River Tp., supra, 193 N.J.Super. at 493, 475 A.2d 59. Yet even this right is neither absolute nor unqualified. In Maurice River Tp., we allowed the Board of Education in the first instance "leave to formulate a set of guidelines designed to regulate and control reasonably the videotaping of its public proceedings ... [so as to] provide ample safeguards for the rights and interests of the Board and the public." Id. at 494, 475 A.2d 59. Thus, the right to videotape public proceedings is subject to reasonable governmental restrictions. Id. at 493, 475 A.2d 59.
Here, no guidelines had been formally established in the relatively short time the videotaping issue presented itself to the council. Nevertheless, the restrictions council placed on plaintiff constituted neither a total nor permanent ban on videotaping, but rather were simply an ad hoc means of regulating the manner in which videotaping would occur. In fact, at the first session in June 2000, plaintiff was allowed to videotape freely, without objection or limitation of any kind. Although plaintiff was not allowed to videotape the September 2000 meeting because of objections from the audience, at the very next session in October, plaintiff was given the opportunity to videotape if he changed location to the front of the room. We find these restrictions neither arbitrary nor capricious, but eminently reasonable under the circumstances, accommodating the conflicting interests and rights of plaintiff, the public and council. As such, we discern no violation of state law on the part of defendants giving rise to any actionable claim by plaintiff.
Having found no constitutional right to videotape, and no arbitrary governmental action in the manner in which plaintiff's common law right was restricted in this instance, we are satisfied that plaintiff's *1064 subsequent arrest and prosecution for disorderly conduct was premised on probable cause, and therefore, afford no basis for his claims for false arrest and malicious prosecution. See Wildoner v. Borough of Ramsey, 162 N.J. 375, 389, 744 A.2d 1146 (2000) (explaining that "probable cause is an absolute defense to [p]laintiff's false arrest ... and malicious prosecution claims").
Preliminarily, we note these claims, which are identical to those fully adjudicated and dismissed in the collateral federal litigation between these same parties, are barred from relitigation here under the doctrine of res judicata. Velasquez v. Franz, 123 N.J. 498, 505, 589 A.2d 143 (1991). In any event, we find independently that plaintiff's refusal to obey the police chief's order to stop videotaping and the consequent disruption of the council's meetings established probable cause to arrest him and proceed to municipal prosecution.
To be sure, "[a] police officer may be liable for civil damages for an arrest if `no reasonabl[e] competent officer' would conclude that probable cause exists." Wilson v. Russo, 212 F.3d 781, 789-90 (3d Cir.2000) (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271, 278 (1986)).
"To prevail on a motion for summary judgment, a public employee need not establish his subjective, i.e., actual, good faith if his conduct was objectively reasonable." Moreover, a public employee can use subjective good faith as a second line of defense at trial, regardless of whether he or she was acting reasonably.
[Mesgleski v. Oraboni, 330 N.J.Super. 10, 25, 748 A.2d 1130 (App.Div.2000) (quoting Brayshaw v. Gelber, 232 N.J.Super. 99, 100, 556 A.2d 788 (App. Div.1989)).]
Additionally, "[w]hether probable cause exists in a given case is essentially a decision for the trial judge who must balance the individual's interest `in being free from police interference' and society's interest `in effective law enforcement.'" Mesgleski, supra, 330 N.J.Super. at 24, 748 A.2d 1130 (quoting State v. Dilley, 49 N.J. 460, 468, 231 A.2d 353 (1967)). Traditionally, probable cause can be decided on summary judgment by the judge if "no genuine issue as to any material fact" or "credibility conflicts[ ]" exist. Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 788 (3d Cir.2000); Montgomery v. DeSimone, 159 F.3d 120, 124 (3d Cir.1998); Groman v. Tp. of Manalapan, 47 F.3d 628, 633 (3d Cir.1995).
In New Jersey, "[a] person commits a disorderly persons offense if, with purpose to prevent or disrupt a lawful meeting, procession or gathering, he does an act tending to obstruct or interfere with it physically." N.J.S.A. 2C:33-8. See State v. Besson, 110 N.J.Super. 528, 534, 266 A.2d 175 (Law Div.1970) (stating that "[t]he purpose of [N.J.S.A. 2C:33-8] is to insure that the good order and decorum of public assemblies will be preserved; that those in attendance may accomplish what they have set out to do without interference or disturbance[ ]"). In assessing governmental action, "[r]easonableness is the key." State v. Lashinsky, 81 N.J. 1, 11, 404 A.2d 1121 (1979).
Hence, where an officer's instructions are obviously reasonable, in furtherance of his duties, an individual toward whom such instructions are directed has a correlative duty to obey them. If his refusal to respond results in an obstruction of the performance of the officer's proper tasks, this will constitute a violation of the disorderly persons statute.
[Ibid. (citation omitted).]
*1065 Thus, "if the police are performing a law enforcement function in an appropriate manner, i.e., not with an excessive use of force, then a citizen is obligated to comply with the directions of the police. Failure to do so can result in a number of offenses". State v. Brennan, 344 N.J.Super. 136, 143, 780 A.2d 585 (App.Div.2001), certif. denied, 171 N.J. 43, 791 A.2d 221 (2002). Moreover, if there is an issue where a citizen's constitutional "rights were impinged by his removal from the meeting, that deprivation could be addressed at a later time." Id. at 146, 780 A.2d 585.
Here, the police chief acted reasonably in light of the surrounding circumstances. There was no showing that defendants "acted arbitrarily or in a manner not calculated in any way to promote public order." Id. at 145, 780 A.2d 585. On this score, we agree with the findings of the Third Circuit in affirming the district court's dismissal of plaintiff's false arrest and malicious prosecution claims:
Here, Chief Welker personally witnessed [plaintiff] undertake conduct to disrupt two Council meetings: [plaintiff] halted the September meeting as he argued with the Council about whether he would be permitted to videotape the proceedings and he delayed the start of the October meeting when he refused to turn off his video camera or change its location. In both cases, the meeting could not proceed until Chief Welker turned off [plaintiff's] video equipment and removed him from the meeting room. Chief Welker thus acted reasonably in believing that [plaintiff's] refusal to stop videotaping or move his video equipment constituted disorderly conduct as tending to obstruct or interfere with the Council's meetings.
[Tarus, supra, 105 Fed.Appx. at 360.]
Lastly, we discern no viable cause of action for defamation based on a council member's statement: "[i]f he [plaintiff] was a decent resident, we would have no problem." Summary dismissal was, therefore, appropriate.
Although insults are offensive, they do not rise to the level of defamation. McLaughlin v. Rosanio, Bailets & Talamo, Inc., 331 N.J.Super. 303, 312, 751 A.2d 1066 (App.Div.), certif. denied, 166 N.J. 606, 767 A.2d 484 (2000). "[O]nly verifiable statements can be defamatory." Ibid. Thus, name-calling and opinions, which "cannot be prove[n] true or false, ... are not actionable." Ibid. Indeed, "opinion[s], as a matter of constitutional law, enjoy absolute immunity." Dairy Stores, Inc. v. Sentinel Publ'g Co., 104 N.J. 125, 147, 516 A.2d 220 (1986). When there is no "settled meaning, the truth or falsity of an insult is not susceptible to ... proof." Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 167, 735 A.2d 1129 (1999). In other words, the reason that "expressions of pure opinion [are] non-actionable as defamation, is... [because] ideas themselves cannot be false." Avins v. White, 627 F.2d 637, 642 (3d Cir.), cert. denied, 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980). The statement therefore is protected under the First Amendment. Nanavati v. Burdette Tomlin Mem'l Hosp., 645 F.Supp. 1217, 1248 (D.N.J.1986), aff'd in part and rev'd in part, 857 F.2d 96 (3d Cir.1988), cert. denied, 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989). Thus, recovery is appropriate only when there are "defamatory false averments of fact and the truth of the statement is a complete defense to a defamation action." McLaughlin, supra, 331 N.J.Super. at 312, 751 A.2d 1066.
Moreover, a plaintiff must prove harm as part of the prima facie case. Id. at 313, 751 A.2d 1066. Accordingly, "to survive a defendant's motion for summary *1066 judgment, a plaintiff must raise a sufficient question of fact as to actual injury to his or her reputation. For example, a plaintiff must adduce `concrete proof' that third parties lowered their estimation of the plaintiff and that he or she suffered emotional or pecuniary harm as a result." Ibid. (quoting Sisler v. Gannett Co., Inc., 104 N.J. 256, 281, 516 A.2d 1083 (1986)).
Here, defendant's statement was clearly opinion, as it cannot be proved or disproved. Further, he has failed to demonstrate any harm suffered as a result of the statement. And finally, contrary to plaintiff's contention, the statement does not qualify as slander per se since it "does not [reasonably] yield an interpretation that... plaintiff ... engag[ed] in ... illegal [conduct]." Romaine v. Kallinger, 109 N.J. 282, 291, 537 A.2d 284 (1988). Consequently, plaintiff's defamation claim was properly dismissed.
Affirmed.
NOTES
[1] Maurice River Tp. Bd. of Educ. v. Maurice River Tp. Teachers Ass'n, 187 N.J.Super. 566, 455 A.2d 563 (Ch.Div.1982), aff'd, 193 N.J.Super. 488, 475 A.2d 59 (App.Div.1984).