187 N.J. Super. 566 (1982)
455 A.2d 563
MAURICE RIVER TOWNSHIP BOARD OF EDUCATION, PLAINTIFF,
v.
MAURICE RIVER TOWNSHIP TEACHERS ASSOCIATION AND NEW JERSEY EDUCATION ASSOCIATION, DEFENDANT.
Superior Court of New Jersey, Chancery Division Cumberland County.
Decided November 24, 1982.
Rushton H. Ridgway for plaintiff (Milstead & Ridgway, P.A., attorneys).
*567 Steven R. Cohen for defendants (Selikoff & Cohen, P.A., attorneys).
EDWARD S. MILLER, J.S.C.
This application by the Maurice River Township Board of Education raises for the first time the question of the right of a member of the public to record the proceedings of a public body by means of videotape. It does not involve any form of the news media; hence the issue of freedom of the press as guaranteed by N.J. Const. (1947), Art. I, par. 6, does not apply. The state constitutional provisions being broader and more liberal than similar provisions in the First Amendment to the United States Constitution, the state provisions govern, leaving to the courts the more restrictive similar guarantees. State v. Deatore, 70 N.J. 100, 112 (1976); State v. Johnson, 68 N.J. 349, 353 (1975). The facts are simple.
Plaintiff Maurice River Township Board of Education was engaged in a labor dispute with its teachers, represented by defendant Maurice River Township Teachers Association. Negotiations had been difficult and unproductive and a factfinding session had been scheduled.
At a regularly scheduled public meeting of the board of education held October 21, 1982, representatives of the Teachers Association attended and attempted to record the proceedings by means of a videotaping machine.
They were requested by the board to desist; they declined to do so, following which the board called the State Police (the municipality does not have a regular police department). Since a solution could not be found, an impasse occurred and the board recessed the meeting and forthwith filed this action to restrain the Association (and presumably any other person) from videotaping any future meeting.
At a hearing on the application for a temporary restraining order the court granted temporary restraints, first, to defuse the labor problem and second, to allow the parties to adequately *568 brief the issues and to prepare a record. The matter now comes before the court on a return date of the order to show cause, and the record is such that the court is able to apply its final decision. Meanwhile, the labor dispute has been settled, although the Teachers Association has declared its intention to videotape further sessions of the board. The matter is now ripe for decision.
First, there is really no question as to the application of the Open Public Meetings Act, N.J.S.A. 10:4-6 et seq. The board concedes it applies and, except as insofar as the failure to allow videotaping is concerned, this is not strenuously contested by the teachers. The board does, however, take the position that it has the right to bar videotapes because such a procedure would disrupt the meeting and is likely to be distracting and intimidating. It further argues that the constitutional and statutory safeguards against evils of clandestine and unlawful means are completely cured by the fact that all meetings are tape-recorded and the tape is preserved by the board secretary and is available to anyone for audition and transcription.
No reported decision exists, although Sudol v. North Arlington, 137 N.J. Super. 149 (Ch.Div. 1975), permitted the tape recording of a meeting of a governing body. Likewise, Guarriello v. Benson, 90 N.J. Super. 233 (Law Div. 1966) dealt on a narrow basis with the right of a member of the public to re-record a properly recorded tape of a public meeting.
This court holds that a member of the public has the right to videotape a public meeting, subject to certain restrictions which this court will impose herein, and that the public body involved has no power to arbitrarily forbid such action. This right is bottomed not upon the statute but upon common law commitment to (paraphrasing Woodrow Wilson) "open government openly arrived at." Indoctrinated by centuries of the bitter, costly and painful process of liberation from the yoke of autocratic government, the founders of this country understood clearly the necessity of free and open discussion. The excesses *569 of the Star Chamber were not forgotten by our forebearers, nor are they unknown to the present generation.
The matter is fully treated by Justice Pashman in Polillo v. Deane, 74 N.J. 562, 569 (1977), and further discussion would prove redundant. The principles reported are not new, but videotaping is.
Videotaping, a recent entrant into the judicial process, is but an extension of the camera process. The latter has been around since the Civil War and, candidly, the abuses of the camera have contributed greatly to the prejudice of the judges and lawyers against it. The prime example is State v. Sheppard, 165 Ohio St. 293, 135 N.E.2d 340; 100 Ohio App. 345, 128 N.E.2d 471 (1955); cert. den. 352 U.S. 955, 77 S.Ct. 323, 1 L.Ed.2d 245 (1956), although by current standards the trial of Bruno Richard Hauptman for the murder of Charles A. Lindbergh, Jr., State v. Hauptmann, 115 N.J.L. 412 (E. & A. 1935), was by modern standards primitive and disgusting.
With the advent of newer and more sophisticated equipment, most of the more objectionable features were cured by audio, and video equipment became silent and able to operate without artificially increased light or noise. In 1979, after a thorough study of the problem, the Supreme Court authorized, on a trial basis, the use of still and video cameras and the use of audio recording procedures in the courts. Canon 3 A(7) of the Code of Judicial Conduct. The experiment proved successful, and the practice is now common in the courts.
The following year, on recommendation of the Civil Practice Committee, the Supreme Court adopted R. 4:14-9 permitting the taking and use of videotaped depositions. It has proven an invaluable tool when properly used, and most persons who have participated in trials or depositions with a videotape concur as to its usefulness and lack of distraction from the judicial process.
In the meantime, the advent of cable television, under the rules of the Federal Communications Commission requiring a *570 local cable outlet, introduced the video process into the public meetings  perhaps not to the delight, but with the concurrence of the bodies concerned.
Plaintiff cites cases from other jurisdictions in support of its argument that there exists no constitutionally guaranteed right to use of videotape. An analysis of each case is unnecessary but, suffice it to say, the court is not persuaded.
First, the cases are bottomed on the First Amendment to the United States Constitution. Even if there were no First Amendment right (and this court holds there is), this case turns on the New Jersey Constitution, Art. I, par. 6. State v. Johnson, supra.
Next, the cases really do not support plaintiff's position. For example, Chandler v. Florida, 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981), permitted (not denied) radio, television and still photography. One has but to compare this case with Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1964), to see the advance, not only in the state of the art but in the judicial approach to it.
CBS, Inc. v. Lieberman, 439 F. Supp. 862 (N.D.Ill. 1976), is a case relied on by plaintiff to advance its theory that a public body somehow differs in its public obligation from the judiciary. The case did not turn on the Illinois Constitution, as this one turns on ours, and hence is not applicable. Moreover, this court believes the decision of that case to be plain error since this court holds that there is a constitutionally guaranteed right to access to a public meeting, Polillo v. Deane, supra.
The plain and simple truth is that in today's modern world, the state of the art is such that it has become a part of the very fabric of modern life. To foreclose its use where the democratic process is complete, as at a public meeting, would not only be unrealistic but irrational.
*571 There are, of course, dangers in the process. As pointed out in Guarriello, supra, it is easier to tamper with a tape-recorded copy of the event than with a photostatic copy. This is precisely why our Supreme Court adopted the procedure and technical guidelines referred to in Canon 3 A(7). It is precisely for this reason this court intends to impose guidelines in this case.
While trial judges are exposed to video cameras under the provisions of Canon 3 A(7), and the court is familiar with it through such experience, the cameras and other equipment in this case not having been identified, the court directed that this equipment be made available for demonstration on the return day of the motion so that the actual process could be evaluated. This tape was then played back to the court. Since this was not a public recording of a trial under the Supreme Court guidelines, the tape was thereafter impounded and is available only for the purpose of an appeal.
Suffice it to say that the court was completely satisfied by this demonstration that the equipment is silent, inoffensive and unobtrusive, and the court finds the use of this type of equipment is neither distracting or inhibiting. The court proposes to allow such use.
It is true that there exists the possibility of tampering and editing of the tape. This can be cured by the presence of a shorthand reporter or official tape, either of which are adequate protection against tampering.
It is further true that there may be  and probably are  persons who would resent the use of such equipment. There are persons who tend to resist tape recording, and it is noted that it took the Legislature's enactment of the Sunshine Law, N.J.S.A. 10:4-6, to bring the public into the arena at all.
When all of the hue and cry of partisan relationships have died away, people then come to realize that in the last analysis it *572 is the frankness and openness of conduct of those entrusted with the administration of government which is  and remains  the bedrock of our democratic system. Those charged with such administration will do well to heed the Biblical admonition: "You shall know the truth and the truth will make you free." John 8:32.
If such exposure is, at times, partisan, vicious and harassing, it must be pointed out that this is part of the price of freedom and, as a President of the United States has pointed out, exposure to heat is part of life in the kitchen.
The court will enter an order permitting the use of videotape in meetings of the board, subject to the following guidelines, based on those of the Supreme Court:
1. A permanent record, either by tape or shorthand reporter, is made of the proceedings.
2. No more than two cameras shall be used at any one time, on a first-come, first-served basis.
3. Equipment used shall be that approved by the Supreme Court guidelines. No additional lighting shall be permitted.
4. Cameras shall be placed in inconspicuous corners of the room toward the rear. The specific location shall be approved by the chairman of the board but shall be in such a place as shall permit unobstructed view of by the camera.
5. Notice shall be given to the board at least one-half hour before the commencement of the meeting, and an opportunity shall be given prior to the meeting to set up the equipment.
6. The board shall be given an opportunity to obtain copies of the tape at its expense, but shall have no power to edit or abridge the same.
7. Those meetings or portions of meetings which are permitted by law to be closed to the public shall not be videotaped.