916 A.2d 1036

ROBERT WAYNE TARUS, PLAINTIFF–APPELLANT, v. BOROUGH
OF PINE HILL, MAYOR LESLIE GALLAGHER AND POLICE
CHIEF JOHN WELKER, DEFENDANTS–RESPONDENTS, AND
JOHN B. KEARNEY, ESQUIRE AND JOHN B. KEARNEY &
ASSOCIATES, P.C., DEFENDANTS.

Argued October 31, 2006—Decided March 7, 2007.

*Thomas Bruno, II,* argued the cause for appellant (*Abramson & Denenberg,* attorneys).

*Michael O. Kassak* argued the cause for respondents Borough of Pine Hill and Mayor Leslie Gallagher (*White and Williams,* attorneys; *Robert E. Campbell,* on the briefs).

*William A. Garrigle* argued the cause for respondent Police Chief John Welker (*Garrigle and Palm,* attorneys; *Mr. Garrigle and Cynthia L. Sozio,* on the briefs).

*John B. Kearney* argued the cause for respondents Borough of Pine Hill and individual defendants on the punitive damage claims (*Kearney & Schweitzer,* attorneys).

*Jennifer A. Klear* submitted a brief on behalf of amicus curiae, American Civil Liberties Union of New Jersey (*Drinker Biddle & Reath and Edward L. Barocas,* Legal Director, attorneys).

Chief Justice ZAZZALI delivered the opinion of the Court.

During our nation's formative days, Patrick Henry declared that "[t]he liberties of a people never were, nor ever will be, secure, when the transactions of their rulers may be concealed from them." *The Debates in the Several State Conventions on the Adoption of the Federal Constitution, As Recommended by the General Convention at Philadelphia in 1787* 169–70 (J. Elliot ed., 1881). With that rationale for open government as our backdrop, in this appeal we examine the breadth of the public's right of access to governmental proceedings under New Jersey law.

At two municipal proceedings in 2000, disputes arose between plaintiff and defendants concerning plaintiff's efforts to videotape the Council meetings. During each meeting, because he refused to comply with the Mayor's order to cease videotaping, the police chief removed plaintiff from the premises and arrested him.

Plaintiff was found not guilty of disorderly conduct and subsequently filed this lawsuit. We are thus presented with the questions whether plaintiff has a right, under the common law or the New Jersey Constitution, to videotape those public meetings and, if so, whether defendants violated such a right. We must also decide whether there was probable cause to arrest plaintiff.

We affirm the Appellate Division's determination that there exists a common law right to videotape a municipal council meeting subject to reasonable restrictions. We find, however, that the Borough and its Mayor violated plaintiff's common law right by imposing arbitrary and unreasonable restrictions that prevented plaintiff from videotaping the Council meetings in question. We also conclude that plaintiff's arrest was premised on probable cause.

I.

A.

Plaintiff Robert Wayne Tarus, a fifteen-year resident of the Borough of Pine Hill (Borough) and active in local politics, regularly attended and participated in Borough Council meetings. Plaintiff considered himself a Borough public watchdog, often criticized the Borough's Mayor and Council, and believed that they changed their policy positions from meeting to meeting. At the March 2000 Council meeting, plaintiff "voiced his opinion" in support of recording public meetings and argued that several judicial decisions had established that "no permission is required to videotape meetings." At the Council's June 2000 meeting, plaintiff began videotaping the proceeding from the rear corner of the room. The Mayor and Council conducted a swearing-in ceremony for three new Borough police officers at the start of the meeting, during which time the officers' family and friends videotaped and photographed the event. Plaintiff continued to videotape the proceeding after that ceremony. Later, when the floor was opened to the public, a councilman objected to further video-

taping on the ground that the camera might intimidate residents in the audience. Plaintiff asserted that he had a right to videotape the meeting, citing *Maurice River Township Board of Education v. Maurice River Township Teachers Ass'n*, 187 *N.J.Super.* 566, 455 *A.*2d 563 (Ch.Div.1982) (hereinafter *Maurice River I* ), *aff'd*, 193 *N.J.Super.* 488, 475 *A.*2d 59 (App.Div.1984) (hereinafter *Maurice River II* ). Mayor Leslie Gallagher (Mayor) echoed the councilman's concerns and asked whether any public attendees objected to being videotaped. Because no one in the audience objected, the Council proceeded with the meeting. Thus, plaintiff videotaped the entire June 2000 meeting.

Plaintiff next attended the Council's September meeting. Plaintiff again set up his camera in the back of the room before the meeting. After the session began, the Mayor informed plaintiff that several individuals did not want to be videotaped and ordered plaintiff to turn off the camera. The Mayor added that it was inappropriate to videotape the meeting with a girls' softball team, comprised of minors, in attendance. Councilmen Robert McGlinchey and Ross Del Rossi also objected to being videotaped. Plaintiff cited the *Maurice River* decisions anew to support his claimed right to videotape the meeting. The Mayor repeated his demand that plaintiff not tape the meeting, and plaintiff again asserted a right so to do. The Mayor then directed Police Chief John Welker to intervene and "remove" plaintiff. Chief Welker told plaintiff to turn off the camera, and, after he refused, escorted plaintiff out of the meeting room. Once outside, Chief Welker offered plaintiff the opportunity to return to the meeting if he agreed not to videotape, but plaintiff declined. Chief Welker then walked plaintiff to the police station in the adjacent building and, after reviewing the code book to determine an appropriate charge, issued plaintiff a "disorderly persons" summons pursuant to a Borough ordinance.

Although the Mayor and Council originally couched their opposition to plaintiff's videotaping in terms of objections from the audience and the potential for intimidation, the Mayor informed

the audience, after plaintiff's removal, that he was concerned that plaintiff might attempt to alter the videotape and then broadcast it. The Mayor subsequently provided the local newspaper with another explanation of their motivations. According to the *Courier–Post*, the Mayor stated:

> The council didn't want him to film them. I asked him to turn off the camera, and he refused to do it. We can't permit private people to film. If it was an organized filming, that would be different.... *If he was a decent resident, we would have no problem.*
>
> [Vanessa Colon, "Resident Gets Summoned for Videotaping Meeting," *Courier–Post*, Sept. 20, 2000, at 1. (emphasis added).]

A month later, at the October 2000 Council meeting, plaintiff once more attempted to videotape the meeting. He set up the camera in the back of the room and began recording prior to the meeting's formal commencement. The Mayor asked plaintiff to turn off the camera before the meeting began, ostensibly because several audience members objected to being videotaped. Councilmen McGlinchey and Del Rossi again opposed plaintiff videotaping the meeting. Plaintiff reiterated that he had a right to videotape the meeting based on *Maurice River*. The Mayor offered to permit plaintiff to videotape the meeting from the front of the room. Plaintiff rejected that proposal because he claimed that he would be unable to record all Council members at once from that vantage point and would be obstructing the views of audience members. Following plaintiff's repeated refusals to turn off the video camera, the Mayor motioned to Chief Welker to intervene and "asked the Chief ... to remove him again." After Chief Welker turned off the video camera, he escorted plaintiff out of the building and issued another summons to him for disorderly conduct. Plaintiff recorded about five minutes of footage prior to the start of the meeting.

One week after the October Council meeting, a municipal court in Camden County tried plaintiff on the two disorderly conduct summonses. Minutes before the trial, and outside the court's presence, the prosecutor offered to dismiss the charges against plaintiff if he agreed not to videotape Council meetings until the

Borough developed guidelines on the use of video cameras. Plaintiff rejected that offer. The prosecutor thereafter advised the Mayor and Chief Welker, both of whom were present, that there was no evidence of disorderly conduct at the October meeting. Nevertheless, the Mayor insisted on proceeding with the prosecution on both charges. During the disorderly conduct trial, the Mayor testified that plaintiff "acted a lot like a gentleman at [the October] meeting." The Mayor also admitted that he had made the "decent resident" statement about plaintiff to the *Courier-Post,* and added that he "wouldn't trust [plaintiff] with a tape [of the meeting]." The municipal court found plaintiff not guilty of the two disorderly conduct charges. The court concluded that plaintiff was entitled to assert his right to videotape the meeting and did so in a manner that did not violate the disorderly conduct ordinance.

A few weeks later, the Borough approved guidelines that, according to defense counsel at oral argument, allow "anyone [to] videotape the meeting as long as they are not disruptive." Since the adoption of the guidelines, the Borough has permitted plaintiff to videotape Council meetings.

## B.

In 2001, plaintiff filed a complaint under 42 *U.S.C.A.* § 1983 against the Borough, the Mayor, and Chief Welker in the United States District Court for the District of New Jersey. Plaintiff alleged that defendants arrested him without probable cause, maliciously prosecuted him in violation of his federal civil rights, and otherwise denied him his rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution. He further argued that defendants violated his rights under both Article I, paragraph 6 of the New Jersey Constitution and New Jersey common law when they prevented him from videotaping the Council meetings. Under state law, plaintiff also made claims of false arrest, false imprisonment, and malicious prosecution against the Mayor and Chief Welker, and a claim of defamation

against the Mayor for his statement to the *Courier-Post* that plaintiff was not a "decent resident." The District Court granted defendants' motions for summary judgment concerning all the federal claims. The court then declined to exercise supplemental jurisdiction over the state law claims and dismissed them without prejudice. The United States Court of Appeals for the Third Circuit affirmed. *Tarus v. Borough of Pine Hill,* 105 *Fed.Appx.* 357 (3d Cir.2004).

In 2003, plaintiff filed a complaint in the Law Division re-alleging his state law claims. In particular, he asserted claims of false arrest, false imprisonment, and malicious prosecution against the Mayor and Chief Welker; defamation against the Mayor; and a violation of his right to videotape under the New Jersey Constitution and the common law against the Mayor, the Borough, and Chief Welker. The Law Division held that plaintiff's constitutional right of access under Article I, paragraph 6 did not include a right to videotape. The court also expressed its doubt that "when [the] common law was in effect . . . anybody ever thought of video cameras," and concluded that plaintiff's rights had not been prejudiced because "he could have had a steno" or "could order the transcripts or the minutes." The Law Division agreed with the federal district court that defendants had probable cause to arrest plaintiff and thus disposed of the state law claims of false arrest, false imprisonment, and malicious prosecution. Finally, the court rejected plaintiff's defamation claim, finding that the "decent resident" comment was rooted in opinion and, therefore, impervious to being proven true or false.

Plaintiff appealed, and the Appellate Division affirmed. *Tarus v. Borough of Pine Hill,* 381 *N.J.Super.* 412, 886 *A.*2d 1056 (App.Div.2005). In its comprehensive opinion, the panel held that plaintiff failed to identify "language in the constitutional provision suggesting it is expansive enough to encompass a right to videotape public proceedings" or "any authoritative case law recognizing such a state constitutional right." *Id.* at 421, 886 *A.*2d 1056. The panel agreed that the New Jersey Constitution's free speech

guarantee includes a right of access to public proceedings that protects both the free discussion of governmental affairs and the corresponding right to receive information. *Id.* at 422, 886 *A.*2d 1056 (citations omitted). Nevertheless, the panel rejected the notion that the constitutional right of access protects the particular manner in which someone chooses to receive the information. *Id.* at 423, 886 *A.*2d 1056.

The Appellate Division further determined that "to the extent we found a right to videotape based on the common law, we held the exercise of such a right was not absolute, but subject to reasonable governmental regulation and control." *Id.* at 422, 886 *A.*2d 1056 (citing *Maurice River II, supra,* 193 *N.J.Super.* at 493–94, 475 *A.*2d 59). The panel found that the restrictions imposed on plaintiff were "neither arbitrary nor capricious, but eminently reasonable under the circumstances." *Id.* at 424–25, 886 *A.*2d 1056. Finally, the Appellate Division concluded that defendants had probable cause to arrest plaintiff, thus affirming the dismissal of plaintiff's false arrest and malicious prosecution claims. *Id.* at 425, 886 *A.*2d 1056.

Plaintiff petitioned this Court for certification of the following questions: whether there is a right under Article I, paragraph 6 of the New Jersey Constitution to videotape public meetings of a local governing body; whether defendants' actions violated his common law right to videotape public meetings; and whether there was probable cause to arrest plaintiff for disorderly conduct because he refused to not videotape the meetings. We granted certification. 186 *N.J.* 255, 893 *A.*2d 722 (2006). We also permitted the American Civil Liberties Union of New Jersey to submit a brief as amicus curiae.

## II.

■ We first consider whether the common law right of public access encompasses a right to videotape. We also examine relevant statutory law and the prevalence of video cameras in society. Next, upon finding a common law right to videotape, we review

the restrictions imposed on plaintiff to determine whether that right was violated. Finally, we resolve whether there was probable cause for plaintiff's arrest.

## A.

We recognize, as did the Appellate Division, "New Jersey's strong public policy favoring open government and 'the general public['s] ... right to be fully informed on the actions of its elected officials.'" *Tarus, supra,* 381 *N.J.Super.* at 422, 886 *A.*2d 1056 (quoting *Sudol v. Borough of N. Arlington,* 137 *N.J.Super.* 149, 154, 348 *A.*2d 216 (Ch.Div.1975)). Our courts "have long recognized a common law right to public information." *Polillo v. Deane,* 74 *N.J.* 562, 570, 379 *A.*2d 211 (1977) (citing *Ferry v. Williams,* 41 *N.J.L.* 332 (Sup.Ct.1879)); *accord Irval Realty, Inc. v. Bd. of Pub. Util. Comm'rs,* 61 *N.J.* 366, 372, 294 *A.*2d 425 (1972) (holding that citizens have common law right "to require custodians of public records to make them available for reasonable inspection and examination"); *Moore v. Bd. of Chosen Freeholders,* 76 *N.J.Super.* 396, 404, 184 *A.*2d 748 (App.Div.) (finding that analysis of common law right of access begins "with the proposition, axiomatic in any democratically constituted society, that the public business is indeed the public's business. The people have a right to know."), *modified,* 39 *N.J.* 26, 186 *A.*2d 676 (1962).

Recognition of the value of open government is not a recent phenomenon. "[T]he common law origins of this important policy may be traced to English law dating back to the first half of the 18th century." *Polillo, supra,* 74 *N.J.* at 570, 379 *A.*2d 211 (citing Attorney General's Committee on the Right to Know, *New Jersey's Right to Know: A Report on Open Government* at 7 (1974)). In England, Jeremy Bentham regarded open judicial proceedings as the cornerstone of a democratic society: "Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." 1 *Jeremy Bentham, Rationale of Judicial Evidence* 524 (London, 1827). James Madison similarly wrote: "Knowledge will forever govern ignorance, and a people

who mean to be their own Governors, must arm themselves with the power knowledge gives." Letter from J. Madison to W.T. Barry (Aug. 4, 1822), *reprinted in* 9 *Writings of James Madison* 103 (G. Hunt ed., 1910). We thus should encourage citizens of a democracy to be more engaged, rather than less, in the government process. As Justice Brennan, then a New Jersey trial judge, acknowledged: "[i]t would be unfortunate in the extreme for the courts of a republic to erect technical barriers by which these duties of citizenship were discouraged or denied." *Casey v. MacPhail*, 2 *N.J.Super.* 619, 623, 65 *A.*2d 657 (Law Div.1949) (quoting *Fagan v. State Board of Assessors*, 80 *N.J.L.* 516, 518, 77 *A.* 1023 (Sup.Ct.1910)) (internal quotations omitted).

That long-standing appreciation of the importance of open government stems, in part, from the understanding that openness reduces public corruption. *See Polillo, supra,* 74 *N.J.* at 571, 379 *A.*2d 211 (quoting Woodrow Wilson's observation that "corruption thrives in secret places, and avoids public places") (citation omitted); Earl Warren, *Governmental Secrecy: Corruption's Ally,* 60 *A.B.A.J.* 550, 552 (1974) ("It would be difficult to name a more efficient ally of corruption than secrecy."). In short, our civic forefathers have long recognized that spores of corruption cannot survive the light of public scrutiny.

New Jersey courts have invoked that touchstone—the need for public access—to afford citizens effective means to record the information gleaned during public proceedings. *See Sudol, supra,* 137 *N.J.Super.* at 153, 348 *A.*2d 216 (holding that citizen has right to use tape recorder because "it is the public policy of the State that the general public has the right to be fully informed on the actions of its elected officials"). "Accuracy in reporting the transactions of a public governing body should never be penalized, particularly in a democracy, where truth is often said to be supreme." *Id.* at 154, 348 *A.*2d 216 (citation omitted).

Accordingly, "[i]f a shorthand record of such a meeting is more accurate than long hand [sic] notes, then the use of shorthand is to be approved; and if the making of a tape record is a still better

method of memorializing the acts of a public body it should be encouraged." *Id.* at 154–55, 348 *A.*2d 216 (citations omitted); *see also Atl. City Convention Ctr. Auth. v. S. Jersey Publ. Co.*, 135 *N.J.* 53, 68, 637 *A.*2d 1261 (1994) (finding that audio tapes have "unique value" because they "constitute ... indisputable evidence of the record of the public event"); *Moore, supra,* 76 *N.J.Super.* at 408, 184 *A.*2d 748 (holding that restricting common law right to inspect and copy public records "to the use of pen, pencil, and pad ... ignore[s] the significant [technological] progress which our generation has witnessed").

The common law therefore has evolved to embrace additional means for documenting public proceedings—not fewer. *See Higg-A-Rella, Inc. v. County of Essex,* 141 *N.J.* 35, 52, 660 *A.*2d 1163 (1995) (finding that common law is flexible and can be adapted to advancing technology); *Atl. City Convention Ctr. Auth., supra,* 135 *N.J.* at 64, 637 *A.*2d 1261 ("The essence of the common law is its adaptability to changing circumstances."). *Sudol, supra,* emphasized the need for the law to adapt to that recording evolution, and, in doing so, illustrated how the common law applies common sense:

> Suppose, for example, that the [local public body] had attempted to prohibit the use of pen, or pencil and paper, at the sessions held by them; such a measure would at once strike anyone as being an improper means of exerting official power, and the surprise and dissatisfaction generated by such an arbitrary rule would undoubtedly lead to a prohibition by the courts of such a foolish attempt to exercise governmental power.
>
> [*Id.* at 154, 348 *A.*2d 216 (quoting *Nevens v. Chino,* 233 *Cal.App.*2d 775, 44 *Cal.Rptr.* 50, 52 (Dist.Ct.App.1965)).]

Thus, over time, quill and parchment gave way to pen and pad; audio recording devices supplanted stenography.

## B.

Our courts first addressed the right to videotape public meetings in 1982 in *Maurice River I, supra,* when the township board of education ordered members of the local teachers association to stop videotaping a board meeting. 187 *N.J.Super.* at 567, 455 *A.*2d 563. The board argued that the video camera would be

"distracting and intimidating" and therefore would disrupt the meeting. *Id.* at 568, 455 *A.*2d 563. The teachers association countered that its videotaping was orderly and unobtrusive; that the de facto ban on videotaping was arbitrary, capricious, and unreasonable; and that they had a constitutional right to record the meeting using the most accurate means available. *Maurice River II, supra,* 193 *N.J.Super.* at 490–91, 475 *A.*2d 59.

The trial court held "that a member of the public has the right to videotape a public meeting, . . . and that the public body involved has no power to arbitrarily forbid such action." *Maurice River I, supra,* 187 *N.J.Super.* at 568, 455 *A.*2d 563. Its rationale included references to our common law commitment to open government, the New Jersey Constitution's broad free speech provisions, and the general spirit of the Open Public Meetings Act. *Id.* at 568–70, 455 *A.*2d 563. The Appellate Division affirmed the trial court's holding that there is a right to videotape municipal proceedings in New Jersey, finding no "per se constitutional, statutory or common law impediments to the use of a video camera to tape record. . . ." *Maurice River II, supra,* 193 *N.J.Super.* at 492, 475 *A.*2d 59. However, because the panel did not state whether the public's right to videotape was grounded in the Constitution, the common law, or statute, the opinion is ambiguous concerning the precise basis for its finding.

Reflecting that ambiguity, two federal courts, when discussing *Maurice River I,* reached different conclusions concerning the rationale for New Jersey's right to videotape. In holding that there was no federal constitutional right to videotape public proceedings, the United States Court of Appeals for the Third Circuit, in *Whiteland Woods, L.P. v. Township of West Whiteland,* expressed the view that the right to videotape found in *Maurice River I* "was based on New Jersey common law, not the First Amendment." 193 *F.*3d 177, 184 n. 3 (1999). Another court, however, cited *Maurice River I* for the proposition that a state constitutional right to videotape public meetings exists in New Jersey. *Belcher v. Mansi,* 569 *F.Supp.* 379, 383–84 (D.R.I.1983).

Although the *Maurice River* decisions may not have been decided exclusively on common law grounds, they rely on broad common law protections of open government to support the conclusion that a right to videotape exists in New Jersey. Further, the *Maurice River* decisions are bolstered by a vast body of case law, outlined above, that underscores the importance of open government and recognizes the right of citizens to document what they see and hear at public meetings.

## C.

The widespread use of video cameras today, coupled with our modern understanding of the importance of both audio and video in memorializing governmental action, buoy that jurisprudential framework. *Maurice River I, supra,* decided over two decades ago, acknowledged the prevalence of video cameras in everyday life:

> The plain and simple truth is that in today's modern world, the state of the art is such that [video] has become a part of the very fabric of modern life. To foreclose its use where the democratic process is complete, as at a public meeting, would not only be unrealistic but irrational.

> [187 *N.J.Super.* at 570, 455 *A.2d* 563.]

In affirming the lower court's decision, the Appellate Division expounded on that idea:

> Video cameras and recorders have become a commonplace item in our every day life. They are a common security device and confront us at the bank, in stores and even in apartment houses. Exposure to video recording of all of us is a normal occurrence on the streets and in public gatherings such as athletic contests and sporting events where participants and spectators are under constant television surveillance. Such exposure is actively sought by all those running for public office in order to place their image and their ideas before the voters.

> [*Maurice River II, supra,* 193 *N.J.Super.* at 492, 475 *A.2d* 59.]

Use of video cameras and our reliance on video to acquire information has expanded dramatically since the *Maurice River* decisions. Today, hand-held video cameras are everywhere—attached to our computers, a common feature in consumer still-shot cameras, and even built into recent generations of mobile telephones. The

broad and pervasive use of video cameras at public events evidences a societal acceptance of their use in public fora.

Commensurate with the use of video recording in society is its intrinsic value in documenting events. "Videotaping is a legitimate way of gathering information for public dissemination and can often provide cogent evidence...." *Robinson v. Fetterman,* 378 *F.Supp.*2d 534, 541 (E.D.Pa.2005). The combination of audio and visual information also affords the most complete record of public proceedings. *Csorny v. Shoreham–Wading River Cent. Sch. Dist.,* 305 *A.D.*2d 83, 89, 759 *N.Y.S.*2d 513 (2003) ("Video cameras provide the most accurate and effective way of memorializing local democracy in action.") Thus, video cameras present distinct advantages over other recording devices, and, with improvements in technology, are no more disruptive than pen and paper or audio tape recorder.

To be sure, some courts have expressed concern over possible negative consequences of allowing videotaping of public proceedings, particularly in the context of judicial proceedings. The use of cameras in the courtroom "might cause the judge, juror or witness to be distracted," endangering the trial's decorum and integrity. *United States v. Kerley,* 753 *F.*2d 617, 622 (7th Cir. 1985). However, those concerns, and myriad others relating to judicial proceedings, are inapposite to the issue now before the Court because public bodies have a vastly different civic function than courts.[1]

So too, we are not persuaded by fears that the use of video cameras in non-judicial settings will generate intimidation and harassment. We agree with *Belcher, supra,* where the court

---

[1] This Court long ago adopted guidelines governing the use of cameras (both still and video) in courtrooms, thus facilitating unobtrusive audio- and video-recordation of judicial proceedings. Many courtrooms in New Jersey are now equipped with both audio- and video-recording devices, eclipsing the traditional role of the court stenographer. Indeed, proceedings before this Court are not only audio- and video-recorded, but are transmitted live via the internet and are electronically archived for later retrieval.

reasoned that "[i]f an individual is willing to stand up and talk in the sometimes volatile setting of a thronged public meeting, at which members of the press are customarily present, that person has little to fear (and much to gain) from the presence of a tape recorder." 569 *F.Supp.* at 383. The court found the benefits far outweighed any negative consequences, and would not "defeat the salutary ends which are served by allowing [public] meetings to be taped, at least without convincing evidence to support the proposition" of audience intimidation. *Ibid.* (citing *Chandler v. Florida,* 449 *U.S.* 560, 575, 101 *S.Ct.* 802, 810, 66 *L.Ed.*2d 740, 752 (1981)). Trepidation over the effect of video cameras in public meetings is overstated. The prevalence of video cameras in society and the open nature of public meetings militate against such hyperbolic concerns. Although some citizens may be fearful of video cameras, we find that consideration insufficient to deny the right to videotape.

■ Further, no right of privacy protects a citizen's public comments. "Those who attend [public] meetings ... fully realize that their comments and remarks are being made in a public forum." *Mitchell v. Bd. of Educ.,* 113 *A.D.*2d 924, 925, 493 *N.Y.S.*2d 826 (1985). As such, "[t]he argument that members of the public should be protected from the use of their words, and that they have [a] privacy interest in their own comments, is therefore wholly specious." *Ibid.* Taken as a whole, the benefits of video recording far outweigh the perceived drawbacks, and the modern use of video cameras buttresses the common law right to videotape.

### D.

The Legislature also has acknowledged the presence of a common law right of public access, and its enactments provide statutory support for the common law right to videotape. The most recent and relevant statutory incarnation of the right of public access to governmental proceedings is in New Jersey's Open Public Meetings Act (OPMA). *N.J.S.A.* 10:4–6 to –21. Enacted in

1975, the OPMA states that the public's right "to be present at all meetings of public bodies, and to witness in full detail all phases of the deliberation, policy formulation, and decision making of public bodies, is vital to the enhancement and proper functioning of the democratic process...." *N.J.S.A.* 10:4–7.

In this Court's maiden application of the OPMA, Justice Pashman acknowledged the common law right of public information and found that the statute "reflects a legislative intention to incorporate such precepts into the very fabric of government in this State." *Polillo, supra,* 74 *N.J.* at 572, 379 *A.*2d 211. The drafters of the OPMA recognized that "secrecy in public affairs undermines the faith of the public in government and the public's effectiveness in fulfilling its role in a democratic society," *N.J.S.A.* 10:4–7, and expressly stated that its provisions "shall be liberally construed in order to accomplish its purpose and the policy of this State as set forth in [*N.J.S.A.* 10:4–7]," *N.J.S.A.* 10:4–21.

Every state and the District of Columbia have codified open public meetings laws. *See* Richard J. Bindelglass, *New Jersey's Open Public Meetings Act: Has Five Years Brought "Sunshine" Over the Garden State?,* 12 *Rutgers L.J.* 561, 561 n. 4 (1981). Some states' statutes explicitly guarantee the right to videotape public meetings. *See, e.g., Mass. Gen. Laws Ann.* ch. 39, § 23B (conferring right to videotape public meetings of governmental body to any person in attendance); *Mich. Comp. Laws Serv.* § 15.263 ("The right of a person to attend a meeting of a public body includes the right ... to videotape.").

Moreover, courts in other states liberally interpret their open meetings statutes to declare a right to record public meetings. For example, although "there is no explicit command within the [New York] Open Meetings Law compelling [public bodies] to permit [their] meetings to be recorded on videotape[,] ... a liberal interpretation of the Open Meeting Law permitting citizens to ... record[ ] the meetings of [public bodies is] wholly consonant with the legislative intent." *Csorny, supra,* 305 *A.D.*2d at 87, 759 *N.Y.S.*2d 513 (interpreting *N.Y. Pub. Off. Law* § 100 (Con-

sol.2006)). Similarly, "a determination that the [Rhode Island Open Meetings Law, *R.I. Gen. Laws* §§ 42–46–1 to –10,] requires [a public body] to allow members of the press and public to tape record its meetings follows inexorably from the policy" of public access to governmental meetings. *Belcher, supra,* 569 *F.Supp.* at 382; *accord Pinellas County Sch. Bd. v. Suncam, Inc.,* 829 So.2d 989, 990–91 (Fla.Dist.Ct.App.2002) (finding that although Florida Sunshine Law "does not explicitly provide for the video recording of public meetings, the refusal to allow such recording certainly violates the 'statute's spirit, intent, and purpose' "). Those courts found support for a right to videotape based on a liberal interpretation of their sunshine statutes, the relevant language of which is substantively similar to that of New Jersey's OPMA.

In short, "[t]he law has embraced the undeniable fact that modern electronic devices are silent observers of history." *Csorny, supra,* 305 *A.D.*2d at 89, 759 *N.Y.S.*2d 513. The legal foundations described above, with roots wide and deep, offer a glimpse into our evolved understanding of the right of public access and support our finding that there is a common law right to videotape.

### III.

Because we recognize a common law right to videotape, we decline to examine the issue through the prism of Article I, paragraph 6 of the New Jersey Constitution. Constitutional questions should be addressed only when necessary to resolve a pending controversy. *State v. Crawley,* 187 *N.J.* 440, 451, 901 *A.*2d 924 (2006) (citing *Donadio v. Cunningham,* 58 *N.J.* 309, 325–26, 277 *A.*2d 375 (1971) ("[A] court should not reach and determine a constitutional issue unless absolutely imperative in the disposition of the litigation.")). We have consistently followed that rule, *see Randolph Town Ctr., L.P. v. County of Morris,* 186 *N.J.* 78, 80, 891 *A.*2d 1202 (2006), and this appeal does not warrant a deviation from that policy of constitutional restraint.

IV.

A.

We now turn our attention to the question whether defendants violated plaintiff's common law right to videotape by restricting his ability to record two Borough Council meetings.

■ The Appellate Division correctly noted that the common law right to videotape is "neither absolute nor unqualified." *Tarus, supra,* 381 *N.J.Super.* at 424, 886 *A.*2d 1056. Citizens are not permitted to disrupt meetings with their recording equipment. Accordingly, public bodies may impose reasonable guidelines to ensure that the recording of meetings does not disrupt the business of the body or other citizens' right of access. *Cf. Nevens, supra,* 44 *Cal.Rptr.* at 52 (finding that city council's restrictions on common law right to videotape were "too arbitrary and capricious, too restrictive and unreasonable"). In *Maurice River II, supra,* the Appellate Division held that a public body could implement "guidelines designed to regulate and control reasonably the videotaping of its public proceedings." 193 *N.J.Super.* at 494, 475 *A.*2d 59. In all circumstances, such guidelines must be neutrally adopted and administered, and limited in scope to the stated purpose of preventing disruption. *Ibid.; see, e.g., Mass. Gen. Laws Ann.* ch. 39, § 23B (conferring right to videotape public meetings to any person in attendance "provided[ ] that in such recording there is no active interference with the conduct of the meeting"); *Mich. Comp. Laws Serv.* § 15.263 (stating that right to videotape is subject to "reasonable rules and regulations in order to minimize the possibility of disrupting the meeting").

■ The guidelines can "include the number and type of cameras permitted, the positioning of the cameras, the activity and location of the operator, lighting and other items deemed necessary to maintain order and to prevent unnecessary intrusion into the proceedings." *Maurice River II, supra,* 193 *N.J.Super.* at 493, 475 *A.*2d 59. Reasonable restrictions may also include those designed "to preserve the orderly conduct of a meeting by control-

ling noise levels [and] spatial requirements ... [,] to safeguard public facilities against damage ... to the meeting hall's electrical system, or ... to require fair payment by the wielder of the device for electricity used." *Belcher, supra,* 569 *F.Supp.* at 384.

## B.

■ In this matter, the Borough had not formally established any guidelines on the right to videotape at the time of plaintiff's arrests. Instead, the Mayor simply ordered him to stop videotaping at both the September and October meetings and asked Chief Welker to intervene when plaintiff refused. The Appellate Division characterized defendants' actions against plaintiff as permissible "ad hoc means of regulating the manner in which videotaping would occur." *Tarus, supra,* 381 *N.J.Super.* at 424, 886 *A.*2d 1056. Defendants similarly argue that the impromptu restrictions administered by the Mayor and Borough were fair and reasonable. We disagree.

At the September 2000 meeting, months after plaintiff first cited *Maurice River* and taped a Borough Council meeting, the Mayor announced that several individuals present did not want to be videotaped and ordered plaintiff to turn off the camera. It is not clear from the record whether any of those concerned individuals were in fact audience members, as opposed to Council members. The Mayor also cautioned that a girls' softball team, attending the meeting to receive recognition from the town, should not be videotaped. Plaintiff indicates, however, that none of the parents opposed him videotaping the meeting. When faced with plaintiff's repeated references to legal precedent, the Mayor asked Chief Welker to intervene and remove plaintiff from the meeting. Plaintiff was again ousted and arrested in October.

The record indicates that plaintiff's video camera was compact, quiet, and generally unobtrusive. Plaintiff, in each instance, set up the camera tripod toward the back of the room and did not, through his videotaping, physically interfere with the Council's business or other citizens' access to the proceedings. As such,

plaintiff's actions were not "disrupting the meeting," *Mich. Comp. Laws Serv.* § 15.263, and did not "interfere with the conduct of the meeting," *Mass. Gen. Laws Ann.* ch. 39, § 23B.

The record also indicates that the Mayor and Council's restrictions were intended, at least in part, to prevent a political opponent, whom they did not trust, from exercising his right to videotape. Even before the present controversy, plaintiff had repeatedly criticized the Council and earned a reputation as an opponent of the Borough's elected officials. That background of animosity provides helpful context for several remarks made by defendants regarding the Borough's treatment of plaintiff. The Mayor stated after the September 2000 Council meeting that "we would have no problem" with plaintiff videotaping if he had been a "decent resident." A month later, during plaintiff's trial for disorderly conduct, the Mayor added that he "wouldn't trust [plaintiff] with a tape" of the meeting. Finally, during oral argument before this Court, defense counsel for the Borough explained that a primary concern expressed by Council members was that "this political opponent ... was going to take tapes and take them back to his basement and edit them around and turn us all into monsters." Thus, by their own admissions, when they blocked plaintiff from videotaping the meetings, the Mayor and Council acted on an impetus that found its genesis, to some degree, in animus against the plaintiff. In that context, we find those actions to be arbitrary and unreasonable.

Defendants also contend that they had insufficient time to develop formal guidelines for videotaping, and simply postponed allowing the use of video cameras until they had a reasonable opportunity to approve guidelines. The Appellate Division agreed that the Borough had a "relatively short time" to approve such guidelines before plaintiff brought the issue to a head. Again, we disagree.

First, *Maurice River II, supra,* was decided sixteen years before plaintiff confronted the Borough with his videotaping demands. 193 *N.J.Super.* 488, 475 *A.*2d 59. The Appellate Division's

1984 holding placed municipalities on notice that citizens have a right to videotape public proceedings subject only to reasonable guidelines administered by the governing body. *Ibid.* Second, plaintiff provided defendants significant notice of his intention to exercise his right to videotape. Plaintiff first expressed an interest in videotaping the Borough's proceedings in March 2000, three months prior to the June videotaping and six months before his first disorderly conduct summons. Specifically, the minutes of the March meeting reflect that plaintiff "voiced his opinion regarding taping public meetings" and cited court "rulings stating no permission is required to videotape meetings." Defendants were reminded in June 2000 of the matter's burgeoning nature when plaintiff videotaped the entire Council meeting and announced his intention to film future meetings. Defendants were thus alerted to the issue long before the fall confrontations.

Therefore, by September 18, 2000, the date of plaintiff's first ejection for attempting to videotape the Council meeting, the Borough had anywhere from six months to sixteen years to develop videotaping guidelines. We find no evidence in the record that the Borough made any effort to formally approve and implement guidelines prior to plaintiff's acquittal on the two disorderly conduct charges. The Mayor and Borough had ample time to do so, had they been committed to affording plaintiff his common law right to videotape.

To be clear, governing bodies are under no obligation to create guidelines limiting the right to videotape. They are merely permitted to do so to ensure that the right does not otherwise interfere with the business of the governing body. If a public body chooses to exercise "the opportunity . . . to formulate reasonable guidelines," *Maurice River II, supra,* 193 *N.J.Super.* at 493, 475 *A.*2d 59, that decision in no way postpones the accrual of the right to videotape until guidelines are established. The Mayor and Council, however, attempted to do just that, treating the lack of guidelines as a pretextual shield to deny plaintiff his common

law right to videotape. Neither *Maurice River II,* nor our holding here, approves that practice.

We conclude that the Borough violated plaintiff's common law right to videotape. The Mayor and Borough declined to implement appropriate guidelines and instead created ad hoc restrictions intended to block a critic from videotaping Council meetings. Because defendants' actions were not neutral and reasonable, they amounted to impermissible restrictions on plaintiff's common law right to videotape.

## V.

Finally, we address whether there was probable cause to arrest plaintiff for refusing to comply with the Mayor's demand that he not videotape the meeting.

This Court has recognized that "the term 'res judicata' refers broadly to the common-law doctrine barring relitigation of claims or issues that have already been adjudicated." *Velasquez v. Franz,* 123 *N.J.* 498, 505, 589 *A.*2d 143 (1991). Collateral estoppel, in particular, represents the "branch of the broader law of res judicata which bars relitigation of *any issue* which was actually determined in a prior action, generally between the same parties, involving a different claim or cause of action." *Sacharow v. Sacharow,* 177 *N.J.* 62, 76, 826 *A.*2d 710 (2003) (quoting *State v. Gonzalez,* 75 *N.J.* 181, 186, 380 *A.*2d 1128 (1977)) (emphasis added).

During plaintiff's federal lawsuit, the District Court thoroughly evaluated whether defendants had probable cause to arrest plaintiff in the context of his federal false arrest, false imprisonment, and malicious prosecution claims. The District Court found that "the record supports the existence of probable cause for [Chief] Welker to have issued plaintiff a disorderly persons summons," and, despite the pressure the Mayor exerted on Chief Welker and the prosecutor, "there is no evidence" that the Mayor had "control" over plaintiff's arrest or prosecution. The United

States Court of Appeals for the Third Circuit affirmed the District Court's finding of probable cause and its subsequent dismissal of the federal claims on the merits. *Tarus, supra,* 105 *Fed.Appx.* at 360.

Notwithstanding the District Court's dismissal "without prejudice" of plaintiff's additional state-law claims of malicious prosecution and false arrest, the Law Division correctly observed that the District Court's finding of probable cause defeated plaintiff's claims in this action. The Appellate Division affirmed, holding that plaintiff's state-law claims were "barred from litigation here under the doctrine of res judicata." *Tarus, supra,* 381 *N.J.Super.* at 425, 886 *A.*2d 1056. We conclude that plaintiff is estopped from relitigating his contention that defendants lacked probable cause for arrest because that issue was "actually determined in a prior action," *Gonzalez, supra,* 75 *N.J.* at 186, 380 *A.*2d 1128. Accordingly, we need not reach that issue on the merits. Because probable cause is an absolute defense to an allegation of malicious prosecution or false arrest, *Wildoner v. Borough of Ramsey,* 162 *N.J.* 375, 389, 744 *A.*2d 1146 (2000), plaintiff's claims must fail.

## VI.

Openness is a hallmark of democracy—a sacred maxim of our government—and video is but a modern instrument in that evolving pursuit. The Mayor and Borough ran afoul of that principle and violated the common law right to videotape by imposing unreasonable ad hoc restrictions. Arbitrary rules that curb the openness of a public meeting are barricades against effective democracy. The use of modern technology to record and review the activities of public bodies should marshal pride in our open system of government, not muster suspicion against citizens who conduct the recording.

In sum, we hold that, subject to reasonable restrictions, members of the public have a common law right to videotape municipal proceedings in New Jersey. Our conclusion is supported by an interwoven tapestry of jurisprudence and policy that

demonstrates both the value of open government and the right to document governmental proceedings. We thereby reaffirm our "common law commitment to . . . 'open government openly arrived at.' " *Maurice River I,* 187 *N.J.Super.* at 568, 455 *A.2d* 563 (paraphrasing Woodrow Wilson).

The judgment of the Appellate Division is affirmed in part and reversed in part. We hold that there is a common law right to videotape municipal council meetings and conclude that plaintiff's common law right was violated here. Because this dispute was decided at the summary judgment stage, we remand the matter to the trial court for further proceedings consistent with this opinion.

*For affirmance in part/reversal in part/remandment*—Chief Justice ZAZZALI, and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.